957 A.2d 237

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Rodney COLLINS, Appellant.**

Supreme Court of Pennsylvania.

Submitted July 14, 2006.

Decided Oct. 21, 2008.

400

404

Kimberly M. Dolan, Esq., for Rodney Collins.

Robin Beth Godfrey, Esq., Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Peter Carr, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Chief Justice CASTILLE.*

The instant matter is before this Court on appellant's appeal from that part of the order of the Court of Common Pleas of Philadelphia County denying him a new trial pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. For the reasons that follow, we affirm the PCRA court's denial of a new trial.

* This case was reassigned to this author.

On May 18, 1993, a jury sitting before the late Honorable Justice Juanita Kidd Stout convicted appellant of first-degree murder and possessing an instrument of crime.[1] The convictions arose from the shooting death of Andre Graves in the early morning hours of July 13, 1992 in the 500 block of North 54th Street in Philadelphia. Graves was shot three times in the head at point-blank range while riding in the passenger seat of a Ford Taurus station wagon that was owned and being driven by his friend, Kevin Cofer, while appellant rode in the backseat.[2] Subsequently, the same jury found two aggravating circumstances and two mitigating circumstances and, after determining that the aggravators outweighed the mitigators, sentenced appellant to death. *See* 42 Pa.C.S. § 9711(c)(1)(iv) ("[T]he verdict must be a sentence of death ... if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.").[3] Represented by new counsel,[4] appellant appealed from his convictions and judgment of sentence to this Court. On October 27, 1997, this Court unanimously affirmed appellant's convictions and judgment of sentence. *Commonwealth v. (Rodney) Collins*, 549 Pa. 593, 702 A.2d 540 (1997). After this Court denied reargument on December 11, 1997, the U.S. Supreme Court denied appellant's petition for a writ of *certiorari* on October 5, 1998. *Collins v. Pennsylvania*, 525 U.S. 835, 119 S.Ct. 92, 142 L.Ed.2d 73 (1998).

On November 10, 1998, appellant filed a timely *pro se* PCRA petition in the Court of Common Pleas of Philadelphia County ("PCRA court"). Following the appointment of coun-

1. Appellant was represented at trial by Louis T. Savino, Jr., Esquire.

2. The facts underlying appellant's convictions are set forth in detail in *Commonwealth v. (Rodney) Collins*, 549 Pa. 593, 702 A.2d 540 (1997).

3. The two aggravating circumstances that the jury found were: (1) appellant knowingly created a grave risk of death to another person in addition to the victim, 42 Pa.C.S. § 9711(d)(7); and (2) appellant had a significant history of violent felony convictions, 42 Pa.C.S. § 9711(d)(9). The two mitigating circumstances that the jury found were: (1) appellant's age at the time of the murder, 42 Pa.C.S. § 9711(e)(4); and (2) appellant's troubled childhood, *i.e.*, any other mitigation evidence concerning appellant's character and record, 42 Pa.C.S. § 9711(e)(8).

4. Appellant's direct appeal counsel was James Bruno, Esquire.

sel,[5] an amended petition was filed on January 19, 2000, and three supplemental petitions were filed thereafter. The Commonwealth filed a motion to dismiss on July 18, 2000. An evidentiary hearing was ultimately held between October 4th and October 8, 2004. On February 15, 2005, the PCRA court, per the Honorable Kathryn S. Lewis, issued an opinion denying relief on all of appellant's guilt-phase claims but vacating appellant's death sentence. The Commonwealth did not appeal from the PCRA court's grant of a new penalty hearing.

Appellant's timely appeal from the denial of a new trial follows. In all, appellant presents a total of fifteen claims for relief: five claims of ineffective assistance of counsel, of which two allege ineffectiveness on the part of both trial and direct appeal counsel while the other three allege ineffective assistance of direct appeal counsel only; six claims of PCRA court error based on the court's denial of a hearing with respect to various other ineffectiveness claims; and four claims of PCRA court error in handling certain discovery and evidentiary matters that arose during the PCRA hearing. In reviewing the PCRA court's decision to deny a new trial, our standard of review is limited to examining whether the court's findings of fact are supported by the record and whether its legal conclusions are free of error. *Commonwealth v. Sneed*, 587 Pa. 318, 899 A.2d 1067, 1071 n. 6 (2006).

## I. INEFFECTIVENESS CLAIMS

Appellant first raises five claims of ineffective assistance of counsel. To merit relief based on an ineffectiveness claim under the PCRA, a petitioner must show that such ineffectiveness "in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). We have interpreted this standard to require a petitioner to prove that: (1) the underlying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) the ineffectiveness of counsel caused the

5. Appellant's PCRA counsel were, and remain, Kimberly M. Dolan, Esquire, and Michael H. Malin, Esquire.

petitioner prejudice. *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 233 (2006), *cert. denied,* ── U.S. ──, 128 S.Ct. 384, 169 L.Ed.2d 270 (2007) (citing *Commonwealth v. (Charles) Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987) (adopting U.S. Supreme Court's holding in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))).[6] "A chosen strategy will not be found to have lacked a reasonable basis unless it is proven 'that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.'" *Commonwealth v. (Rasheed) Williams,* 587 Pa. 304, 899 A.2d 1060, 1064 (2006) (quoting *Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233, 237 (1998)). To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different. *Sneed,* 899 A.2d at 1084 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding. *Id.* A failure to satisfy any one of the three prongs of the test for ineffectiveness requires rejection of the claim. *Id.* at 1076.

█ As previously noted, two of appellant's five ineffectiveness claims allege ineffective assistance of trial counsel. Because appellant was represented by new counsel on direct appeal, and his appeal was pending on collateral review prior to our decision in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), these two claims are cognizable only as "layered claims." *Id.* at 739 n. 16. That is, to be eligible for relief on these two claims, appellant must plead and prove that: (1) trial counsel was ineffective for a certain action or

**6.** Although Pennsylvania's *Pierce* test divides the performance element into separate prongs for arguable merit and reasonable basis, it does so only for ease of application. As this Court has repeatedly noted, the *Pierce* and *Strickland* standards themselves are coextensive. *See, e.g., Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 594 n. 8 (2007); *Commonwealth v. (Brian) Hawkins,* 586 Pa. 366, 894 A.2d 716, 721 n.10 (2006); *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822, 829 (2005); *Commonwealth v. Edmiston,* 578 Pa. 284, 851 A.2d 883, 890 (2004); *Commonwealth v. Busanet,* 572 Pa. 535, 817 A.2d 1060, 1066 nn. 10, 11 (2002).

failure to act; and (2) direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness. *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1023 (2003). As to each relevant layer of representation, appellant must meet all three prongs of the *Pierce* test for ineffectiveness. *Id.* (citing *Commonwealth v. (Michael) Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001), *abrogated on other grounds, Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002)).[7] A failure to satisfy any of the three prongs of the *Pierce* test requires rejection of a claim of ineffective assistance of trial counsel, *Sneed*, 899 A.2d at 1076, which, in turn, requires rejection of a layered claim of ineffective assistance of direct appeal counsel, *McGill*, 832 A.2d at 1023.

As appellant has properly layered his two claims that allege ineffective assistance of trial counsel, we proceed to reach the merits of appellant's ineffectiveness claims, looking first, in each instance, to the underlying claim of trial counsel ineffectiveness. For ease of discussion, although appellant's Brief to this Court presents his layered claims first and fourth in sequence, we have reordered appellant's ineffectiveness claims such that the two layered claims appear first and second in our analysis, followed by the three claims of ineffective assistance of direct appeal counsel only.

## A. Trial Counsel's Failure to Present Expert Testimony to Refute Commonwealth's Ballistics Evidence

Appellant first claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to counter the testimony of Philadelphia Police Officer John Finor of the Firearms Identification Unit, who testified for the Commonwealth that the gunshots that killed Mr. Graves were fired from the backseat of the Ford Taurus station wagon. Appellant argues that trial counsel should have consulted with his own ballistics expert prior to trial. According to appellant, such expert would have advised trial counsel not to pursue

7. Although the *McGill* Court cited the 2001 *Pierce* case in explaining the availability of relief on a layered claim, the seminal case in our ineffectiveness jurisprudence is, of course, the 1987 case that bears the same name. *See (Charles) Pierce, supra.*

counsel's "crackpot" theory that the shooter stood outside the Taurus and would have testified that the shots were more likely fired from the driver's seat, rather than the backseat, of the car. Appellant's Brief at 24.

■ In response, the Commonwealth first argues that appellant waived this claim for failing to plead it in his PCRA petition. The Commonwealth notes that, although appellant did plead in the petition the "theory that a ballistician should have been called to testify in support of the defense [presented at trial] that the gunshots were likely fired from **outside** the [Taurus]," appellant failed to plead in the petition the "theory that a defense ballistician should have been called ... to testify that the gunshots were likely fired from **[within] the driver's side of** the [Taurus]." Commonwealth's Brief at 10. Citing *Commonwealth v. Wilson*, 580 Pa. 439, 861 A.2d 919 (2004), the Commonwealth contends that these are "substantially different" claims and that the "newly constructed claim" is waived since appellant failed to amend his PCRA petition to plead it. Commonwealth's Brief at 13.

In his reply brief, appellant responds to the Commonwealth's waiver argument by contending that, while "the theories or arguments [he presents] in support of [t]his claim" differ from those presented in support of the claim as pleaded in his PCRA petition, the claim itself is one and the same. Reply Brief at 3 (citing *Commonwealth v. (Ronald) Collins*, 585 Pa. 45, 888 A.2d 564, 570 (2005) (distinguishing between "issue" and "theories or allegations in support of a single issue")). Appellant contends that *Wilson* is distinguishable from the instant case because Wilson presented additional facts at his PCRA hearing that were not contained in his PCRA pleadings or supporting affidavits, whereas appellant did not.

To be eligible for post-conviction relief, appellant must show "[t]hat the allegation of error has not been previously litigated or waived." 42 Pa.C.S. § 9543(a)(3). Section 9544 of the PCRA defines "previously litigated" and "waived" as follows:

### § 9544. Previous litigation and waiver

**(a) Previous litigation.**—For purposes of this subchapter, an issue has been previously litigated if:

(1) Deleted.

(2) the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue; or

(3) it has been raised and decided in a proceeding collaterally attacking the conviction or sentence.

**(b) Issues waived.**—For purposes of this subchapter, an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, . . . on appeal or in a prior state postconviction proceeding.

42 Pa.C.S. § 9544. Thus, in defining both "previously litigated" and "waived," Section 9544 refers to the term "issue," which the provision itself leaves undefined. Moreover, Section 9544 uses the term "issue" even though Section 9543(a)(3), the provision for purposes of which Section 9544 defines "previously litigated" and "waived," uses the term "allegation of error." *See Commonwealth v. Gwynn*, 596 Pa. 398, 943 A.2d 940, 944 n. 4 (2008).

In *(Ronald) Collins, supra*, we were presented with the question of the proper interpretation of "previously litigated" for purposes of the PCRA. That question required us to define the term "issue," which we discussed as follows:

There is nothing in this subsection defining "issue". That term, as used in "pleading and practice," is understood to mean "a single, certain, and material point, deduced by the allegations and pleadings of the parties, which is affirmed on the one side and denied on the other." BLACK'S LAW DICTIONARY, 6th ed. 831. Thus, "issue" refers to the discrete legal ground that was forwarded on direct appeal and would have entitled the defendant to relief. The theories or allegations in support of the ground are simply a subset of the issue presented. Stated another way, there can be many theories or allegations in support of a single issue, but ultimately, § 9544(a)(2) refers to the discrete legal ground raised and decided on direct review. Thus, at the most

basic level, this section prevents the relitigation of the same legal ground under alternative theories or allegations.

*(Ronald) Collins,* 888 A.2d at 570 (footnote and citation omitted). Our interpretation of "issue" in *Collins* applies for purposes of Section 9544(b) (defining "waived") as well as Section 9544(a) (defining "previously litigated"). *See Gwynn,* 943 A.2d at 944 (noting that, in *Collins,* we defined "issue" within meaning of Section 9543(a)(3)).

In the supplemental PCRA petition he filed on July 18, 2000, appellant presented the following claim:

> Petitioner is entitled to a new trial because trial counsel was ineffective in failing to investigate and present expert testimony to dispute the prosecution witness' version of events and the ballistician's conclusions that the shots were fired from within the car in violation of Petitioner's Fifth, Sixth and Fourteenth Amendment rights and Article I, Sections 9 and 13 of the Pennsylvania Constitution.

Supplemental PCRA Petition at 2 (unnumbered) (filed July 18, 2000). In the pleadings offered in support of this claim, appellant elaborated on the claim and restated it in various ways. In restating the claim, appellant used, *inter alia,* the following language:

> ... **Petitioner's counsel did nothing**—either during or after trial—**to obtain a defense expert to challenge Officer John Finor's conclusions that the physical evidence was consistent with Kevin Cofer's version of events** and the prosecution's theory that the shots were fired from within the car.

* * * *

**Counsel's failure** to obtain an expert to testify regarding the inconsistencies between the physical evidence and the conclusion that the shots were fired from within the car and **to challenge the reliability and credibility of the tests conducted by Officer Finor constituted deficient performance.**

*Id.* at 3–4 (emphasis added). In support of this claim, appellant attached to his supplemental petition an affidavit from Lieutenant William N. Welch, a "firearms identification" consultant and retired Maryland State Trooper, stating his opinion that it was "highly unlikely" that two cartridge cases found in the street near the Taurus were fired "from within" the vehicle.

While appellant alleged in support of his claim that Lieutenant Welch would have testified that at least two of the shots were most likely fired from outside the Taurus, this allegation is not the issue or grounds for the relief he requested. The Commonwealth is correct in noting that appellant did not plead in his PCRA petition "the **theory** that a defense ballistician should have been called at trial to testify that the gunshots were likely fired from the driver's side of the station wagon." Commonwealth's Brief at 10 (emphasis added) (other emphasis omitted). As we explained in *(Ronald) Collins,* however, "[t]he theories or allegations in support of the ground [for relief] are simply a subset of the issue presented." 888 A.2d at 570. As the above-quoted recitations of the issue in his PCRA petition make clear, appellant's claim that trial counsel was ineffective for failing to obtain his own ballistics expert was supported by several allegations, including not just that such expert would have refuted Officer Finor's conclusion that the shots were fired inside the Taurus, but also that such expert testimony would have: (1) challenged the reliability and credibility of the test results upon which the Commonwealth relied; and (2) undermined the testimony of Commonwealth witness Kevin Cofer, the driver of the Taurus.

As for the Commonwealth's reliance upon *Wilson,* we agree with appellant that this case is distinguishable. On appeal in *Wilson,* the appellant claimed that the Commonwealth failed "to provide exculpatory evidence relating to [Commonwealth witness Edward] Jackson's prior *crimen falsi* conviction for impersonating a public servant" and "mental health evaluations of Jackson and [Commonwealth witness Jeffrey] Rahming that purportedly could have been used to impeach them." *Wilson,* 861 A.2d at 927. Although Wilson's PCRA petition

included a claim of improperly withheld discoverable evidence, the petition did not identify Jackson's *crimen falsi* conviction or the mental health evaluations of Jackson and Rahming as the evidence allegedly withheld. Instead, in the petition, Wilson claimed that the Commonwealth withheld evidence of "coercion and threats by [the police] directed against Jackson, Rahming, and [a third Commonwealth witness]." *Id.* at 928. To state the grounds for the relief he requested in his PCRA petition, Wilson had to identify the evidence that he was alleging the Commonwealth withheld—*i.e.,* "the Commonwealth should have provided *x* evidence." In contrast, in the case *sub judice,* at least for purposes of mere pleading, appellant did not necessarily need to explain **how** Lieutenant Welch would have refuted the Commonwealth's case against appellant in order to state that his request for relief was based on trial counsel's failure to hire Welch or some other independent ballistics consultant. More importantly, at the PCRA hearing, appellant developed the "driver as shooter" theory by eliciting opinion testimony from Lieutenant Welch that it was "highly unlikely" that the shots that killed Graves came from the backseat of the Taurus. Notes of Testimony ("N.T."), 10/7/04 (a.m.), at 53. Therefore, we reject the Commonwealth's argument that appellant waived this ineffectiveness claim.

█ In denying relief on the merits of this claim, the PCRA court cited the strategic reasons testified to by trial counsel at appellant's PCRA hearing for not retaining a ballistics expert. In particular, the court cited: (1) trial counsel's desire to avoid the prospect of his own expert confirming the Commonwealth's theory that the gun had been fired from the backseat of the Taurus; and (2) trial counsel's focus on attempting to create reasonable doubt through cross-examination of the Commonwealth's witnesses. As for prejudice, the PCRA court cited the PCRA hearing testimony of Lieutenant Welch conceding that the ballistics evidence could support the Commonwealth's theory that the shots were fired from the backseat of the Taurus. Consequently, the court concluded, trial counsel's failure to present at trial the testimony of Lieutenant

Welch or another independent ballistician did not result in prejudice to appellant's case.

Appellant argues that the strategic reasons relied upon by the PCRA court for counsel's failure to call an expert such as Lieutenant Welch are unreasonable. As for trial counsel's desire to avoid the prospect of his own expert confirming the Commonwealth's theory that the gun had been fired from the backseat of the Taurus, appellant argues that this reason fails to account for former Rule of Criminal Procedure 305,[8] which, at the time of appellant's trial, allowed the defense to shield discovery of expert reports so long as the defense expert was not called to testify at trial. With respect to trial counsel's focus on attempting to create reasonable doubt through cross-examination of the Commonwealth's witnesses, appellant complains that trial counsel's cross-examination of Officer Finor was itself ineffective and that it would not have been had trial counsel consulted with a ballistics expert like Lieutenant Welch. Finally, appellant disputes the PCRA court's conclusion that failing to call Lieutenant Welch or some other expert did not prejudice appellant, insisting that "none of the 'concessions' that Mr. Welch made at the PCRA hearing were devastating to the defense." Appellant's Brief at 26. Appellant maintains that, if presented at trial, Lieutenant Welch's testimony "might have influenced" the jury's verdict. *Id.*

The Commonwealth defends both of the reasons cited by the PCRA court as a reasonable strategy for trial counsel's decision not to call a ballistics expert such as Lieutenant Welch to testify for the defense. Citing *Commonwealth v. Wallace*, 555 Pa. 397, 724 A.2d 916 (1999) and *Commonwealth v. Clemmons*, 505 Pa. 356, 479 A.2d 955 (1984), the Commonwealth argues that trial counsel's decision to rely on cross-examination of the Commonwealth's witnesses was a reasonable strategy. This approach, the Commonwealth contends, allowed counsel to attempt to create reasonable doubt by shifting suspicion away from appellant and, simultaneously, in two other directions. On the one hand, trial counsel elicited testimony from the Commonwealth's expert witnesses that the

8. Pa.R.Crim.P. 305 was renumbered Rule 573 in 2000.

shots could have been fired by Kevin Cofer from the driver's seat. At the same time, counsel was able to argue, based on two cartridge casings found outside the Taurus as well as testimony from Commonwealth witnesses, that the shots could have been fired by a member of the "Boys from the Bottom," a West Philadelphia gang that had beaten Graves the day before the murder as punishment for allegedly stealing a car from one of its members.

In response to appellant's reliance on former Rule 305, the Commonwealth concedes that trial counsel "perhaps could have attempted to structure his discussions with the hypothetical expert in such a way as to avoid **mandatory** discovery obligations." Commonwealth's Brief at 17. Nevertheless, the Commonwealth contends, trial counsel "could not have ensured that the trial court would not issue a **discretionary** discovery order." *Id.*

The Commonwealth further argues that, in addition to being reasonable, trial counsel's decision not to hire his own ballistics expert was not in itself prejudicial. The Commonwealth contends that Lieutenant Welch's testimony-particularly his opinion that it would have been awkward for someone sitting "directly behind" Graves to shoot him-would not have been helpful when considered in conjunction with appellant's own statement to police, telling them that he had been sitting not "directly behind" Graves but in the middle of the backseat.

We agree with the Commonwealth that trial counsel did not act in a constitutionally unreasonable fashion in choosing to cast suspicion simultaneously on both Cofer and the supposed Boys from the Bottom gang rather than attempt to find a competing defense ballistician to paint Cofer as the only possible perpetrator. The Commonwealth had the sole burden of proof at trial. By eliciting testimony from Commonwealth witnesses about the feud between Graves and the Boys from the Bottom, trial counsel was able to emphasize in closing argument that, if anyone had a motive to kill Graves, it was members of the Boys from the Bottom, not appellant. *See, e.g.,* N.T., 5/17/93, at 733–34 ("Motive. What do we know about this case? We know that Mr. Graves had a fight with

people from The Bottom, everybody says that, we all agree.... There is no evidence in this world to suggest that Mr. Collins ever had a motive, a reason, a will to do what happened to [Mr. Graves]."); *id.* at 737 ("If anyone had a motive [for killing Graves] it is the 'people Down The Bottom'."). At the same time, in the absence of any defense expert testimony narrowing the potential list of suspects, trial counsel was able to cast suspicion in his closing argument on Kevin Cofer as well. *See, e.g., id.* at 729 ("What does Kevin Cofer have to hide? I think that should be the paramount question, ladies and gentlemen, regarding this case."); *id.* at 731 ("What is this man trying to hide? Did Kevin Cofer render aid? The man with nothing to hide? What did he do? Your recollection prevails. He fled. He fled."); *id.* at 745–46 ("We don't have to prove a case against Kevin Cofer, but there is reasonable doubt."). In his PCRA hearing testimony, when asked whether he had made a strategic decision not to consult with a ballistics expert, trial counsel confirmed that he "made a strategic decision to cross-examine witnesses" presented by the Commonwealth instead, in order "to try to create a reasonable doubt and have Mr. Collins found not guilty." N.T., 10/8/04, at 69; *see also id.* at 120–21 (trial counsel's affirming the strategic basis for his determination not to call a ballistics expert). Therefore, because appellant failed to show that trial counsel lacked a reasonable strategic basis for choosing not to call a ballistics expert, his underlying claim fails, and his claim that appellate counsel was ineffective for failing to raise this issue necessarily fails as well.

### B. Trial Counsel's Failure to Investigate Conflict of Interest

█ Appellant next claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to disclose to appellant an "actual conflict" of interest that compromised counsel's ability to zealously represent appellant. Appellant's Brief at 44. Appellant alleges that while trial counsel, Louis Savino, Esquire, represented him in the instant case, Attorney Savino was also representing Aaron Montague (a.k.a. "Little Man"), whose car victim Andre

Graves allegedly stole shortly before he was murdered, at least according to a police statement provided by Graves' friend, Charles Brown. According to appellant, Brown's statement "put [Savino] on notice that Little Man ... had a clear motive for murdering Mr. Graves." *Id.* at 45. Appellant further alleges that, due to this supposed "actual conflict" of interest, Savino never introduced evidence at appellant's trial that Graves stole Montague's car, contending that such evidence would have established a motive by another person for Graves' murder. In addition, appellant argues that "[t]he PCRA court's ruling on this issue should be reversed because it applied the wrong standard in assessing trial counsel's conflict." *Id.* at 44.

In response, the Commonwealth contends that the purported conflict of interest on the part of trial counsel is illusory. Conceding that Attorney Savino represented Montague in two unrelated matters, the Commonwealth argues that neither matter could have affected Savino's performance at appellant's trial because the first matter concerned a drug possession conviction and ended nine months before appellant's trial, while the second matter was an aggravated assault case that arose after appellant's trial. Additionally, the Commonwealth emphasizes that, at appellant's trial, Savino attempted to cast suspicion on the Boys from the Bottom, the gang of which Montague was leader, and simply lacked sufficient evidence to single out Montague himself as the perpetrator. Even assuming Savino was ineffective, the Commonwealth argues, direct appeal counsel could not reasonably have been expected to determine the identity of "Little Man," whom in a statement a single witness named as the owner of the car Graves allegedly stole—let alone investigate a potential connection between "Little Man" and Savino—because direct appeal counsel had no reason to believe that any such connection existed.

In its opinion, the PCRA court noted that: (1) Attorney Savino testified at the PCRA hearing that he had not viewed Montague as a suspect in Graves' murder; (2) Savino's representation of Montague at Montague's sentencing hearing predated Savino's representation of appellant; (3) both defense

counsel and the Commonwealth stipulated at the hearing that the name Aaron Montague is not mentioned anywhere in the trial discovery in appellant's case; and (4) Savino's representation of Montague and of appellant involved completely unrelated charges. Accordingly, the court found that Montague's and appellant's interests "did not diverge with respect to a material fact or legal issue or to a course of action." PCRA Ct. Op. at 38. Finding no arguable merit in appellant's underlying claim of trial counsel ineffectiveness, the court concluded that direct appeal counsel was not ineffective for failing to raise the claim.

An appellant cannot prevail on a preserved conflict of interest claim absent a showing of actual prejudice. *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1094 (1998). Nevertheless, we presume prejudice when the appellant shows that trial counsel was burdened by an "actual"—rather than mere "potential"—conflict of interest. *Commonwealth v. (Thomas) Hawkins*, 567 Pa. 310, 787 A.2d 292, 297 (2001). To show an actual conflict of interest, the appellant must demonstrate that: (1) counsel "actively represented conflicting interests"; and (2) those conflicting interests "adversely affected his lawyer's performance." *Id.* at 297–98 (quoting *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1175 (1986) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and holding that "[a]ppellant's defense was not prejudiced by the fact that, at a prior time, his counsel had represented a Commonwealth witness")). Clients' interests actually conflict when "during the course of representation" they "diverge with respect to a material factual or legal issue or to a course of action." *Commonwealth v. Padden*, 783 A.2d 299, 310 (Pa.Super.2001); *Commonwealth v. Toro*, 432 Pa.Super. 383, 638 A.2d 991, 996 (1994); *In Interest of Saladin*, 359 Pa.Super. 326, 518 A.2d 1258, 1261 (1986).

We first address appellant's assertion that the PCRA court applied the wrong standard in assessing the merits of the underlying claim. As appellant notes, to succeed on his claim that trial counsel was burdened with a conflict of interest, appellant must show that the interests of counsel's two clients

actually conflicted. Appellant defines an actual conflict as occurring when the two clients' interests "diverge with respect to a material factual or legal issues [sic] or to a course of action." Appellant's Brief at 44 (quoting *Saladin, supra* ). This is the same definition of an actual conflict that the PCRA court applied below. *See* PCRA Ct. Op. at 38 (taking same quotation from *Toro, supra,* that appears in *Saladin* ). Therefore, notwithstanding appellant's assertion that the PCRA court applied the wrong standard to his underlying conflict-of-interest claim, appellant can prevail only if the PCRA court's application of the definition of actual conflict is unsupported by the record *sub judice.*

As the PCRA court noted, Attorney Savino's first representation of Montague occurred on July 7, 1992, prior to Graves' murder, and consisted of an appearance at a sentencing hearing in Philadelphia Municipal Court in connection with a drug offense. *See* N.T., 10/8/04, at 53, 102–03; PCRA Petition, Exhibit 4. Savino's representation of Montague in this matter ended on July 22, 1992, nine days after Graves' murder, when Scott DiClaudio, Esquire, another attorney from Savino's office, appeared on behalf of Montague at another sentencing hearing. *See* N.T., 10/8/04, at 47, 49. Savino next represented Montague in an unrelated matter at a hearing in Municipal Court on December 31, 1993, more than seven months after appellant's trial for Graves' murder. *See id.* at 103; PCRA Petition, Exhibit 4. Appellant does not allege that Savino represented Montague at any time between July 22, 1992 and appellant's trial.

On July 19, 1992, three days before Attorney Savino's representation of Montague in the unrelated drug case ended, Charles Brown gave his police statement alleging that Graves stole a car owned by "Little Man." *See* N.T., 10/8/04, at 35–36; PCRA Petition, Exhibit 1 at 3. As appellant notes, when Savino ultimately read Brown's statement, Savino knew that this "Little Man" "could be" the same Little Man whose real name was Aaron Montague, the same Aaron Montague on whose behalf Savino had appeared in court on July 7th. N.T., 10/8/04, at 36. Nevertheless, Savino could not have read

Brown's statement before August 18, 1992, which is when he received the pre-trial discovery materials in appellant's case from the prosecution, *see id.* at 104–05, and appellant alleges no other basis upon which Savino should be charged with notice of the supposed potential conflict of interest. By August 18th, however, Savino was no longer representing Montague, Savino's involvement in that case having ended nearly one month earlier. Accordingly, the PCRA court did not err in determining that appellant had failed to show an actual conflict of interest and that, therefore, there was no basis upon which to presume that prejudice actually resulted to appellant from Savino's prior representation of Montague. Because appellant's underlying claim of trial counsel ineffectiveness lacks arguable merit, his claim that direct appeal counsel was ineffective for failing to raise the conflict-of-interest claim necessarily fails.

## C. Admission of Lead Residue Test Results

■■■ Appellant next claims that direct appeal counsel was ineffective for failing to argue that the trial court erred in denying a defense motion for either: (1) exclusion of test results introduced by the Commonwealth showing lead residue on the Taurus' passenger seat headrest; or (2) a continuance to allow defense counsel to obtain an expert who might provide testimony countering this evidence. Appellant alleges that the prosecution "ambushed" the defense with the lead residue test results by failing to provide them to the defense until the second day of trial (Appellant's Brief at 28), even though "the police had the results five days before [then]" (*id.* at 29). Appellant further avers that the trial court's denial of trial counsel's motion "crippled" the defense because trial counsel had already committed to the theory that the shots were fired from outside the Taurus. *Id.* at 28. Citing *Commonwealth v. Metzger,* 498 Pa. 678, 450 A.2d 981 (1982), appellant contends that the trial court's ruling deprived him of due process, a fair trial, and the effective assistance of counsel.

In response, the Commonwealth argues that there was no underlying discovery violation because the prosecutor turned

the test results over to the defense on the same day he obtained them from the police chemist. In any event, the Commonwealth contends, even if the trial court had granted a continuance, defense counsel would not have hired a ballistician because he had a reasonable strategic basis for not doing so. *See supra* at 12–13. Moreover, even if defense counsel had hired a ballistician, the Commonwealth insists, such expert could not have refuted the incontrovertible presence of lead residue on the headrest, which, even Lieutenant Welch agreed in his PCRA testimony, meant that the shots had been fired at close range.

The PCRA court determined that appellant was not entitled to relief on this claim because trial counsel testified at the PCRA hearing that he chose not to obtain a ballistics expert for strategic reasons. The PCRA court distinguished *Metzger*, reasoning that the Commonwealth's lead residue test results in the instant case did not completely undermine the defense theory of the case. In any event, the PCRA court determined, the Commonwealth did not commit a discovery violation, as it "turned over the [lead residue] report as soon as it became available." PCRA Ct. Op. at 42; *see also id.* at 40 (citing testimony indicating that Commonwealth disclosed report on same day it was prepared).

 Pennsylvania Rule of Criminal Procedure 573 provides, in pertinent part, as follows:

### Rule 573. Pretrial Discovery and Inspection

\* \* \* \*

#### (B) Disclosure by the Commonwealth.

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

\* \* \* \*

(e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant **that are within the possession or control of the attorney for the Commonwealth;**

\* \* \* \*

**(D) Continuing Duty to Disclose.** If, prior to or during trial, either party discovers additional evidence or material previously requested or ordered to be disclosed by it, which is subject to discovery or inspection under this rule, or the identity of an additional witness or witnesses, such party shall promptly notify the opposing party or the court of the additional evidence, material, or witness.

\* \* \* \*

Pa.R.Crim.P. 573 (emphasis added). The Commonwealth does not violate Rule 573 when it fails to disclose to the defense evidence that it does not possess and of which it is unaware. *Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75, 97 (2004) (citing *Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997)).

As the text of Rule 573(B)(1) suggests, when the evidence is exclusively in the custody of police, possession is not attributed to the Commonwealth for purposes of Rule 573. *Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136, 1142 (2001). Whether the Commonwealth's failure to disclose evidence that is exclusively in police custody constitutes a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), of course, is a different matter. If the undisclosed evidence implicates *Brady* (*i.e.,* if it is favorable to the accused and its non-disclosure resulted in prejudice to his case), then the Commonwealth is charged with its possession even while it is exclusively in the custody of police. *Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Burke,* 781 A.2d at 1142 & n. 6 (making this distinction between *Brady* cases and Rule 573 cases).

Although appellant claims that the Commonwealth's failure to disclose the lead residue test results before the second day of trial prejudiced his case, appellant does not allege that the evidence itself was favorable to his defense (as it obviously was not). Accordingly, appellant's ineffectiveness claim can only be bottomed upon an alleged violation by the Commonwealth of Rule 573 rather than *Brady*. Thus, the *Kyles* rule does not apply to the instant claim, and, even if true, appellant's allegation that "the police lab knew the results of the testing several days before the start of trial" (Appellant's Brief at 29) would be unavailing.[9] Appellant does not dispute the PCRA court's finding that the Commonwealth disclosed the lead residue report on the very same day it was obtained, nor does he allege that the prosecutor was aware of the test results before that time, *see id.* (conceding that "[i]t is unclear when Mr. Costanzo (the ADA) knew the results of the testing") (emphasis omitted). Therefore, the trial court did not err in denying the defense motion to exclude the test results or for a continuance to allow defense counsel to obtain an expert who might provide testimony countering this evidence. Because the underlying claim lacks arguable merit, appellate counsel was not ineffective for failing to raise it on appeal.

### D. Notice to Defense of Removal of Items from Taurus and of Return of Taurus to Owner

Appellant next claims that direct appeal counsel was ineffective for failing to argue on direct appeal that appellant's right to due process was violated by the Commonwealth's failure: (1) to notify the defense prior to jury selection that various items had been removed from the Taurus and were available for testing ("notice-of-removal claim"); and (2) to preserve the Taurus for a defense inspection ("car-preservation claim"). Citing Pa.R.Crim.P. 573(B)(1)(f) and *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), appellant argues that, as part of "routine pre-trial discovery," the Com-

9. We need not address appellant's remaining arguments in support of the instant claim, as they rest upon the erroneous premise that the Commonwealth's failure to disclose the lead residue test results before the second day of trial violated Rule 573.

monwealth was obliged to produce a property receipt indicating that the Commonwealth had removed, *inter alia,* the passenger-side headrest from the Taurus. Appellant's Brief at 40 (developing notice-of-removal claim). As support for his car-preservation claim, appellant also relies upon *Trombetta,* insisting that, by releasing the Taurus to its owner, the Commonwealth prevented the defense from conducting testing that "could have disclosed evidence refuting the prosecution's theory that gunshots were fired from the back seat area." *Id.* at 42. As a result of the Commonwealth's failure either to provide notice of its removal of the headrest or to preserve the Taurus for defense inspection, appellant contends, "[t]rial counsel chose his defense based on an incomplete discovery record, which ensured that he would be subject to trial by ambush." *Id.* at 43. Appellant does not allege that he ever requested that the Taurus either be preserved, or made available, for defense inspection.

In response, the Commonwealth contends that the instant claim of ineffective assistance of appellate counsel fails because appellant failed to raise either of the two underlying claims before the trial court, noting that appellant does not presently argue that trial counsel was ineffective for such failure.[10] In any event, the Commonwealth argues, both the notice-of-removal claim and the car-preservation claim lack merit. With respect to the notice-of-removal claim, the Com-

10. As further support for its waiver argument with respect to the notice-of-removal claim, the Commonwealth argues that appellant failed to plead this claim in his PCRA petition. In response, appellant in his reply brief cites Claim V of his first counseled PCRA petition, which alleged that chemical testing of the headrest should not have been admitted at trial because the Commonwealth belatedly produced that evidence. Acknowledging the Commonwealth's position that the instant underlying notice-of-removal claim is obviously distinct from Claim V, appellant nonetheless contends that the Commonwealth's waiver argument is "based on nothing more than inconsequential variations between the way in which the claims were pled below and the way they have been presented here." Reply Brief at 17.

Because we find, for the reasons explained below, that appellant waived the instant notice-of-removal claim for failing to raise it before the trial court, we need not address the Commonwealth's alternate contention that appellant waived the claim for failing to plead it in his PCRA petition.

monwealth denies that prejudice to appellant resulted and, in any case, notes that appellant never requested access to the items that the Commonwealth removed from the Taurus. As for appellant's car-preservation claim, the Commonwealth emphasizes that the Taurus had no exculpatory value. Finally, although it is not helpful to the Commonwealth's case, the Commonwealth laudably reminds us of *Commonwealth v. Deans*, 530 Pa. 514, 610 A.2d 32, 34 (1992), in which this Court ordered the suppression of evidence concerning an allegedly forged lottery ticket because the ticket constituted "the primary evidence" against the defendant and was destroyed before the defense could examine it. The Commonwealth urges us to reconsider *Deans*, contending that it is contrary to the U.S. Supreme Court's subsequent decision in *Illinois v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004) (*per curiam*) and was not decided on independent state grounds, and, in any event, is inapposite.

In his reply brief, appellant denies that he waived his two underlying claims for failing to present them before the trial court. Appellant asserts that he could not have raised either claim before the trial court because the facts in support of the claims were known only to the Commonwealth and did not become available to him until the PCRA hearing. As for the merits of the claims, appellant does not address *Commonwealth v. Deans* or *Illinois v. Fisher* in his reply brief.

After determining that appellant failed to prove that the police withheld exculpatory evidence or acted in bad faith, the PCRA court concluded that neither claim underlying the instant ineffectiveness claim had arguable merit. In particular, the court noted that the Commonwealth "turned over the results from the tests done on the car as soon as they became available," thereby providing appellant with an opportunity to attack the reliability and accuracy of the test results. PCRA Ct. Op. at 49. The court further noted that the Taurus was released to its owner "[i]n accordance with standard police procedure." *Id.*

The central alleged facts forming the basis of appellant's underlying due process claim are: (1) the Commonwealth's

failure to timely notify the defense of the removal of the headrest from the Taurus; and (2) the Commonwealth's failure to preserve the Taurus for a defense inspection. Notwithstanding appellant's assertion in his reply brief, the defense first became aware of these facts long before the PCRA hearing. In fact, as appellant notes in his initial brief, it was on May 5, 1993, the second of three days of jury selection, that trial counsel learned of the removal of the items from the Taurus. *See* Appellant's Brief at 39 (citing N.T., 5/7/93, at 103 (referencing trial counsel's awareness of same two days prior)). Likewise, it was on May 10, 1993, the second day of appellant's five-day trial, that trial counsel received a copy of the report of the lead residue test police conducted on the headrest. N.T., 5/10/93, at 345. Therefore, the record belies appellant's bald assertion in his reply brief that "[t]he facts underlying his due process claim were not available to prior counsel" (Reply Brief at 17). Moreover, appellant's theory depends upon an assumption that the defense was entitled to access to the Taurus in a relatively undisturbed state. That is a claim that trial counsel obviously could have forwarded by requesting such access, but he did not. Accordingly, to the extent it relies on the Commonwealth's failure to notify the defense of the removal of the headrest, appellant's claim that direct appeal counsel was ineffective for failing to raise the underlying due process claim fails because it does not address trial counsel's ineffectiveness for failing to raise the due process claim before the trial court.

Turning to appellant's car-preservation claim, consistently with former Rule of Criminal Procedure 305(B) as it was numbered at the time of appellant's trial, Rule 573(B) provides, in pertinent part as follows:

**Rule 573. Pretrial Discovery and Inspection**

**(B) Disclosure by the Commonwealth.**

(1) *Mandatory.* In all court cases, **on request by the defendant** ... the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the de-

fendant's attorney to inspect and copy or photograph such items.

\* \* \* \*

(f) any tangible objects, including documents, photographs, fingerprints, or other tangible evidence;

\* \* \* \*

Pa.R.Crim.P. 573(B) (emphasis added). Appellant does not allege that he ever actually requested a defense inspection of the Taurus. Therefore, appellant failed to trigger any mandatory discovery obligation on the part of the Commonwealth with respect to the Taurus, and appellant's car-preservation claim necessarily fails.

Appellant's reliance on *California v. Trombetta, supra,* is equally unavailing. *Trombetta* was an appeal from the conviction of two motorists for drunk driving. At trial, the State introduced the results of the defendants' blood-alcohol content tests, and the defendants sought to suppress the test results, relying on the State's failure to preserve the breath samples used in the test. After their convictions were overturned on appeal, the High Court reversed, citing three reasons. First, "the officers here were acting in good faith and in accord with their normal practice," the Court determined, adding that "[the record contains no allegation of official animus towards] [the defendants] or of a conscious effort to suppress exculpatory evidence." *Trombetta,* 467 U.S. at 488, 104 S.Ct. 2528. Second, the defendants failed to show that the evidence of their blood-alcohol content "possess[ed] an exculpatory value that was apparent before the evidence was destroyed." *Id.* at 489, 104 S.Ct. 2528. And third, the defendants failed to show that they "would be unable to obtain comparable evidence by other reasonably available means." *Id.* Although the *Trombetta* Court suggested that the defendants' failure to show bad faith was less important than its failure to make the other two showings, *see id.* at 488–89, 104 S.Ct. 2528 four years later, in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the High Court clarified that "unless a

criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333 (so phrasing its holding in the case); *accord Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666, 676 (1999) (discussing *Youngblood* ).

*Youngblood* was reaffirmed only four years ago in *Illinois v. Fisher, supra.* *Fisher* presented the question of whether the "Due Process Clause required the dismissal of criminal charges because the police, acting in good faith and according to normal police procedures, destroyed evidence that [the defense] had requested more than 10 years earlier in a discovery motion." *Fisher,* 540 U.S. at 545, 124 S.Ct. 1200. Fisher appealed his conviction of possession of cocaine after the trial court denied his motion to dismiss the charge based on the State's destruction, "acting in accord with established procedures," of the substance seized from him during his arrest. *Id.* at 546, 124 S.Ct. 1200. On appeal, the Appellate Court of Illinois reversed Fisher's conviction, holding that the Due Process Clause required dismissal of the charge, even though there was "nothing in the record to indicate that the alleged cocaine was destroyed in bad faith." *Id.* at 546–47, 124 S.Ct. 1200. In so holding, the Appellate Court acknowledged *Youngblood's* bad-faith requirement but determined that *Youngblood* was not controlling "because, unlike in *Youngblood,* the destroyed evidence provided [Fisher]'s only hope for exoneration and was essential to and determinative of the outcome of the case." *Fisher,* 540 U.S. at 547, 124 S.Ct. 1200 (citation and internal quotation marks omitted). After the Supreme Court of Illinois denied leave to appeal, the U.S. Supreme Court granted *certiorari* and summarily reversed, specifically disagreeing with the Illinois Appellate Court's grounds for distinguishing *Youngblood.* Leaving little room for doubt, the High Court clarified that "the applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between

'material exculpatory' evidence and 'potentially useful' evidence." *Fisher*, 540 U.S. at 549, 124 S.Ct. 1200.

As previously noted, this Court in *Deans, supra*, ordered the suppression of evidence concerning an allegedly forged lottery ticket based on "the specific facts" of that case. In so holding, although the *Deans* Court did mention that the lottery ticket was "the primary evidence" against the defendant, such was not our sole grounds for distinguishing the case from *Arizona v. Youngblood*. Rather, we noted that *Deans* "differ[ed] from most other cases regarding lost evidence in that Deans' lottery ticket was lost before he was charged with committing an offense" and that, therefore, "[a]t no time did he or defense counsel have an opportunity to examine the allegedly forged ticket." *Deans*, 610 A.2d at 35 (citing various other cases involving loss or destruction of evidence after a defendant had been arrested and charged, thus allowing defense opportunity to request expert examination of prosecution's evidence while evidence was available). Moreover, the *Deans* Court noted that the due process inquiry depends also on the nature of the tests conducted on the evidence at issue. While some types of tests (*e.g.*, chemical analyses) yield degrees of probability "sometimes amounting almost to a certainty," others (*e.g.*, psychiatric examinations) yield far more controversial results. *Id.* When viewed in these parameters, the authenticity of the lottery ticket in *Deans* "appear[ed] to be at least somewhat subjective." *Id.* It was for these reasons that we explicitly limited our holding in *Deans* to "the specific facts in this record." *Id.*

Instantly, appellant alleges in his Brief "a pattern of nondisclosure generally and particularly focused on evidence from the car." Appellant's Brief at 41. In particular, in addition to reiterating the allegations set forth above, appellant alleges that the police: (1) failed to test the items removed from the interior of the Taurus in a timely fashion; (2) failed to swab the interior of the Taurus for gunshot residue; and (3) lost certain witness statements. Appellant's allegations do not amount to the kind of "official animus" or "conscious effort to suppress" that warrants a finding of bad faith on the part of

the police within the meaning of *Trombetta.* Moreover, appellant fails to challenge the PCRA court's finding that the Taurus was released to its owner "[i]n accordance with standard police procedure," nor does he explain his failure to make an affirmative request for a defense inspection of the Taurus. Therefore, we agree with the Commonwealth that the instant case is readily distinguishable from *Deans.*[11] More importantly, we find *Fisher* controlling and, accordingly, conclude that appellant's underlying due process claim lacks arguable merit. Therefore, appellant's derivative ineffectiveness claim necessarily fails.

### E. Discrimination in Jury Selection

Appellant's final ineffectiveness claim is that direct appeal counsel was ineffective for failing to argue that the trial prosecutor violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) by discriminating against African–Americans in jury selection. Appellant contends that the race-neutral reasons that the trial prosecutor gave at the PCRA hearing for striking African–American venirepersons were pretextual in nature. Appellant also complains that he was prejudiced by the Commonwealth's allegedly untimely production of notes that the prosecutor took during *voir dire.*

In response, the Commonwealth first argues that this claim fails because trial counsel failed to raise a *Batson* claim at trial and appellant does not now allege that trial counsel was ineffective for such failure. On the merits, the Commonwealth contends that appellant's claim fails for two independent reasons: (1) he failed to establish a *prima facie* case of racial discrimination; and, in any event, (2) the trial prosecutor offered race-neutral reasons at the PCRA hearing for his peremptory challenges, and the PCRA court credited those reasons.

In its opinion, the PCRA court first noted that both appellant and the victim were black, that the petit jury was

11. For this reason, we postpone revisiting *Deans* in light of *Fisher* until we are presented with a case that squarely presents the continuing vitality of *Deans.*

majority-black, and that the fact that a majority of the jurors were of the same race as the *Batson* claimant weighed against granting relief. Without determining whether appellant had established a *prima facie* case of discrimination, the PCRA court proceeded to find that the trial prosecutor had offered race-neutral reasons for exercising all of his peremptory challenges and that appellant had failed to prove purposeful discrimination.

In his reply brief, appellant denies that he failed to argue that trial counsel was ineffective for failing to raise a *Batson* claim at trial. "To the extent that there was any ambiguity whatsoever in the Initial Brief," appellant summarily asserts: "(a) that the *Batson* claim itself is of arguable merit; (b) that trial counsel had no reasonable basis for failing to object to the prosecutor's strikes; [and] (c) that it is reasonably likely that, had counsel objected, the outcome of his trial would have been different[.]" Reply Brief at 22.

 "[I]n order to succeed on an unpreserved claim of racial discrimination in jury selection ... a post-conviction petitioner may not rely on a *prima facie* case under *Batson,* but must prove actual, purposeful discrimination by a preponderance of the evidence **in addition to all other requirements essential to overcome the waiver of the underlying claim.**" *Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 87 (2004) (emphasis added) (citation omitted). A claim is waived if it is raised for the first time in a reply brief. *Commonwealth v. Wharton,* 571 Pa. 85, 811 A.2d 978, 990 (2002). "[T]he mere incantation of the magic words of counsel ineffectiveness is insufficient to overcome waiver." *Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 609 (2007).

Appellant does not dispute that trial counsel could have raised a *Batson* claim at trial. Therefore, appellant's failure to address trial counsel's ineffectiveness in his initial brief is fatal to his claim. Even if appellant could cure such failure by inserting a previously absent claim of trial counsel ineffectiveness in his reply brief (which he cannot), appellant's boilerplate recitation in his reply brief of the three prongs of the

test for ineffective assistance of trial counsel falls far short of the requisite developed arguments that trial counsel lacked a reasonable basis for failing to raise a *Batson* claim at trial and that counsel's failure in this regard resulted in prejudice to appellant's case. Because appellant's underlying *Batson* claim is waived, his derivative claim of ineffective assistance of direct appeal counsel necessarily fails.

## II. CLAIMS OF PCRA COURT ERROR

### A. PCRA Court's Denial of Evidentiary Hearing on Certain Ineffectiveness Claims

 Appellant next claims that the PCRA court erred in denying an evidentiary hearing with respect to certain other claims of ineffective assistance of direct appeal counsel.[12] In death penalty cases, a PCRA court is required to allow a petitioner to develop the record with respect to any "genuine issues concerning any material fact." Pa.R.Crim.P. 909(B). "Where the PCRA court determines that a hearing is required as to some, but not all, of the issues raised in a petition, the hearing may be limited to those issues." *Commonwealth v. Edmiston*, 578 Pa. 284, 851 A.2d 883, 899 (2004).

#### 1. *Police statement and preliminary hearing testimony of Kevin Cofer*

 In his first underlying issue based on the PCRA court's denial of an evidentiary hearing, appellant claims that

12. The Commonwealth argues that these claims are waived for appellant's failure to include a signed certification from both trial and direct appeal counsel as to their testimony at the hearing, as required by 42 Pa.C.S. § 9545(d)(1). Appellant responds in his reply brief that the Commonwealth's waiver argument is waived because it was not raised before the PCRA court, which did not dismiss any of the claims on the basis of the absence of signed certifications. Appellant further notes that, if the Commonwealth had raised his failure to include the signed certifications before the PCRA court, he would have been entitled to the opportunity to cure the deficiency pursuant to Pa.R.Crim.P. 905(B) (allowing PCRA court to order amendment of PCRA petition that is defective as originally filed).

Because we find, for the reasons explained below, that each of the claims that the PCRA court denied without a hearing lacks merit, we decline to address the Commonwealth's waiver argument.

the PCRA court should have allowed him to develop the record regarding prior counsel's failure to challenge the trial court's admission of a statement provided to the police by Kevin Cofer, as well as testimony Cofer gave at a preliminary hearing, both of which implicated appellant in Graves' murder. Appellant argues that the police statement and preliminary hearing testimony were inadmissible at trial because appellant was deprived of the opportunity to cross-examine Cofer about them, either at the preliminary hearing or at trial, where, appellant states, after disavowing the prior statement and testimony, Cofer invoked his Fifth Amendment right not to testify further. Appellant contends that he was substantially prejudiced by the admission of Cofer's prior statement and testimony because they comprised "the Commonwealth's only evidence that directly implicated Mr. Collins." Appellant's Brief at 54.[13]

The Commonwealth responds that the instant claim is frivolous. Citing *Crawford v. Washington*, 541 U.S. 36, 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) for the proposition that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements," the Commonwealth first emphasizes that appellant was "free to face and cross-examine [Cofer] at [trial]." Commonwealth's Brief at 58. The Commonwealth specifically disputes appellant's representation that Cofer invoked his Fifth Amendment right not to testify, noting that Cofer merely attempted to invoke it, after which the trial

13. In the course of setting forth this claim, appellant asserts that, because the trial court did not give a limiting instruction, the jury was free to consider Cofer's prior statement and testimony implicating appellant as substantive evidence of appellant's guilt rather than simply as evidence to impeach Cofer. Appellant, however, does not present this as a separate underlying claim of trial court error and provides no authority in support of it. While it is worth noting that the relevant authority would seem contrary to such a claim, *see Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7, 10 (1992) (holding that prior inconsistent statements may be used as substantive evidence when, *e.g.*, given under oath at formal legal proceeding or reduced to writing signed and adopted by witness), we are precluded from rendering meaningful appellate review of the lack of a limiting instruction at appellant's trial due to his failure to develop a stand-alone claim on this basis.

court properly compelled him to continue to testify. As an independent reason why the instant underlying claim fails, the Commonwealth cites Pa.R.E. 803.1(1) ("Inconsistent statement of witness"), noting that Cofer's preliminary hearing testimony was given under oath at a formal legal proceeding and that his police statement was reduced to a writing, which Cofer signed and adopted. The PCRA court determined that both Cofer's preliminary hearing testimony and his police statement were admissible at trial. PCRA Ct. Op. at 25 (applying *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992)).

Pennsylvania Rule of Evidence 803.1(1) provides as follows:

**Rule 803.1. Hearsay exceptions; testimony of declarant necessary**

The following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement:

**(1) Inconsistent statement of witness.** A statement by a declarant that is inconsistent with the declarant's testimony, and (a) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) is a writing signed and adopted by the declarant, or (c) is a verbatim contemporaneous recording of an oral statement.

Pa.R.E. 803.1(1). Although Rule 803.1 was adopted subsequent to appellant's trial, it merely codifies decisions of this Court announced prior thereto. *See, e.g., Lively*, 610 A.2d at 10.

On July 14, 1992, the day after Graves' murder, Cofer was interviewed by homicide detectives. After initially denying that he was present at Graves' murder, Cofer informed the detectives that he, in fact, witnessed the shooting and that appellant was the shooter. Cofer provided a written statement to the detectives to this effect and signed each page of the statement. On August 5, 1992, Cofer testified at a preliminary hearing consistently with his July 14th police statement.

On Friday, May 7, 1993, the Commonwealth called Cofer to testify at appellant's trial. Although Cofer acknowledged during direct examination that he had told the detectives all the details contained in the statement, N.T., 5/7/93, at 124–67, Cofer also testified at trial that the police statement was essentially untrue—*i.e.,* that he did not witness Graves' murder and was not even present at the time, *id.* at 137–46. Later during direct examination, Cofer acknowledged that his testimony at the preliminary hearing was under oath and in the presence of appellant and appellant's trial counsel. *Id.* at 172–73. Cofer subsequently testified, however, that he had lied at the preliminary hearing when testifying that he saw appellant shoot Graves. *Id.* at 177–85. Cofer further testified at trial that both his police statement and his preliminary hearing testimony were coerced by detectives and that he feared he would be charged with Graves' murder if he did not provide information inculpating appellant. *Id.* at 116–17, 163, 203, 218–19. Appellant's trial recessed for the day before the end of Cofer's direct examination.

When the prosecutor resumed direct examination of Cofer on Monday, May 10, 1993, Cofer immediately attempted to invoke his Fifth Amendment right not to testify. N.T., 5/10/93, at 227. The trial court, however, instructed Cofer to continue testifying, which he did. *Id.* at 231. Cofer's direct examination concluded shortly thereafter, whereupon defense counsel began cross-examination. Defense counsel questioned Cofer extensively concerning the nature and circumstances of Cofer's July 14, 1992 police statement. For example, during cross-examination, defense counsel elicited the following testimony from Cofer: that he did not remember having been read his *Miranda*[14] warnings before he was questioned by detectives, N.T., 5/10/93, at 253; that the detectives told him they were going to "give [him] a homicide," *id.;* that he had initially told detectives that he was not present at Graves' murder and that this initial version of events was true, *id.* at 254; and that the detectives told him that appellant "was in another room

14. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

telling them that [Cofer] had killed [Graves]" and that "[Assistant District Attorney] David Webb and [then-Judge] Lynn[e] Abraham would see to it that [Cofer] got the homicide if [Cofer] didn't cooperate," *id.* at 255. Defense counsel also cross-examined Cofer extensively concerning the nature and circumstances of Cofer's August 5, 1992 preliminary hearing testimony. For example, defense counsel elicited testimony from Cofer that, shortly before the preliminary hearing, the trial prosecutor told Cofer, "Maybe you ought to tell them that you seen a gun," *id.* at 257, and that Cofer had testified falsely at the preliminary hearing out of fear of "get[ting] the homicide [him]self" because the detectives who interviewed him "said they would get a homicide on [him] if [he] didn't cooperate," *id.* at 258.

Therefore, the record thoroughly belies appellant's contention that Cofer was not "subject to cross-examination concerning [his prior] statement[s]" as required by Pa.R.E. 803.1. As the PCRA court determined, the additional prerequisites for admitting Cofer's July 14, 1992 police statement were clearly satisfied, *see* Pa.R.E. 803.1(1)(a); *Lively, supra,* as were the additional requirements for admitting his August 5, 1992 preliminary hearing testimony, *see* Pa.R.E. 803.1(1)(b); *Lively.* There was no basis for trial counsel to object. Accordingly, because there is no genuine issue of material fact with respect to this underlying claim of trial court error, appellant's derivative ineffectiveness claim did not warrant an evidentiary hearing in the PCRA court.

### 2. Lack of corrupt source instruction

Appellant claims that the PCRA court erred in refusing to hold a hearing on appellant's claim that prior counsel were ineffective for failing to raise the trial court's failure to issue a corrupt source instruction to the jury in connection with Cofer's testimony. Appellant argues that the jury could have reasonably inferred that Cofer was an accomplice in Graves' murder (or actually committed it) based on Cofer's conduct at trial as well as his testimony that "the police considered him a suspect in the murder" (Appellant's Brief at

56) and that detectives threatened to arrest him for the murder and told him that appellant had implicated him in the crime. Appellant contends that, had the trial court instructed the jury that Cofer was a corrupt and polluted source, there is a reasonable likelihood that appellant would have been acquitted.

In response, the Commonwealth first argues that a corrupt source charge would have been inconsistent with appellant's defense that he played no role in Graves' killing. In any event, the Commonwealth adds, appellant would not have been entitled to a corrupt source charge in connection with Cofer's testimony because there was no evidence at all that Cofer was an accomplice to Graves' murder, much less sufficient evidence to warrant such a charge.

The PCRA court determined that there was no arguable merit to the underlying corrupt source instruction claim, finding that "there was no evidence presented that Kevin Cofer participated in the murder of Andre Graves." PCRA Ct. Op. at 12.

A corrupt source instruction advises the jury that if it finds that a certain witness who testified against the defendant was an accomplice of the defendant in a crime for which he is being tried, then the jury should deem that witness a "corrupt and polluted source" whose testimony should be considered with caution. *Commonwealth v.(Roy) Williams*, 557 Pa. 207, 732 A.2d 1167, 1181 (1999); *accord Commonwealth v. Hackett*, 534 Pa. 210, 627 A.2d 719, 724 (1993). The instruction is warranted only in cases in which there is sufficient evidence to present a jury question with respect to whether the witness is an accomplice. *(Roy) Williams*, 732 A.2d at 1181; *Hackett*, 627 A.2d at 724.

Section 306(c) of the Crimes Code defines accomplice liability as follows:

(c) **Accomplice defined.**—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

. (ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S. § 306(c). Accordingly, accomplice liability requires evidence that the person: (1) intended to aid or promote the substantive offense; and (2) actively participated in that offense by soliciting, aiding, or agreeing to aid the principal. *Commonwealth v. Rega,* 593 Pa. 659, 933 A.2d 997, 1014 (2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1879, 170 L.Ed.2d 755 (2008). One merely present at the crime scene is not an accomplice, *id.,* nor is one who merely helps an offender try to escape arrest or punishment an accomplice, *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176, 1183 (1993); *Hackett,* 627 A.2d at 725.

As evidence that Cofer was an accomplice in Graves' murder, appellant cites the following: (1) Cofer's testimony "that the police considered him a suspect in the murder"; (2) Cofer's claim that detectives told him that they would arrest him for the murder and that appellant had implicated him in the crime; (3) Cofer's temporary refusal to continue testifying at trial; and (4) defense counsel's argument at trial that Cofer was the shooter. Appellant's Brief at 56. Appellant does no more than baldly assert that this "evidence" was sufficient for the jury to reasonably conclude that Cofer was an accomplice in Graves' murder; in fact, appellant fails even to mention the definition of an accomplice.

Appellant's failure to even attempt to show that the requirements of accomplice liability were met by actual evidence here is not surprising. To begin with, notwithstanding appellant's contention to the contrary, Cofer himself, in fact, testified that the detectives told him that they did not believe appellant's out-of-court accusation that Cofer was the shooter, N.T., 5/7/93, at 120, and when asked whether Cofer was ever told by detectives that he was a suspect in the case, Cofer said, "No," N.T., 5/10/93, at 253. The fact that, during the police investi-

gation, appellant attempted to shift the blame from himself to Cofer, the only person other than himself and Graves who was present in the Taurus when Graves was killed, was not evidence either that Cofer intended to aid in Graves' murder or that Cofer actively participated in the crime. Cofer's sudden refusal to continue testifying at the end of his direct examination when trial resumed on Monday, May 10, 1993 after a weekend recess reflects, at most, his own subjective fear of prosecution, but that conduct was not evidence of his participation in the murder. Moreover, appellant cites no evidence to suggest that such supposed fear was objectively reasonable. In fact, in light of Cofer's recantation of his preliminary hearing testimony and his police statement implicating appellant, Cofer's subjective fear was more likely of retaliation by appellant, or of prosecution for perjury. *See* N.T., 5/7/93, at 168–69 (Cofer's testimony as to his current fear of being killed in prison); *Commonwealth v. (Rodney) Collins,* 549 Pa. 593, 702 A.2d 540, 543 (1997) (noting admission at trial of two letters written by appellant to Cofer "press[ing] Cofer to recant or risk being branded a 'snitch' "). Finally, defense counsel's attempt to cast suspicion on Cofer at trial is unhelpful to appellant's underlying corrupt source instruction claim, as "it is well-settled that arguments of counsel are not evidence," *Commonwealth v. Puksar,* 951 A.2d 267, 280 (Pa.2008). Therefore, appellant has failed to raise a genuine issue of material fact with respect to this underlying ineffectiveness claim, and the PCRA court did not err in denying a hearing thereon.

### 3. Reasonable doubt instruction

Appellant next claims that the PCRA court erred in denying a hearing on his claim that prior counsel were ineffective for failing to argue that the trial court improperly instructed the jury concerning reasonable doubt. Appellant contends that, by instructing the jury that a reasonable doubt is "the kind of doubt that would **restrain** a reasonable man or woman from acting in a matter of importance to himself" (Appellant's Brief at 59 (quoting N.T., 5/17/93, at 797) (emphasis appellant's)), the trial court "improperly diminished the

Commonwealth's burden of proof and infringed upon the presumption of innocence" (*id.* at 58). Appellant submits that the trial court was required to instruct, as per PA. STANDARD CRIMINAL JURY INSTRUCTIONS § 7.01(3), that "[a] reasonable doubt is a doubt that would cause a reasonably careful and sensible person to **hesitate** before acting upon a matter of importance in his own affairs." Appellant's Brief at 59.

The Commonwealth briefly counterargues that this underlying claim is based on a merely "semantical" distinction and is identical to a claim this Court rejected in *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890 (1999). The PCRA court deemed the claim lacking in arguable merit, noting that this Court had repeatedly refused to require the word "hesitate" over "restrain" in reasonable doubt instructions.

We rejected this identical claim as recently as last year in our decision in *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790 (2007). In *Rios*, in denying relief on the claim that a trial court's "use of the word 'restrain' rather than 'hesitate' set[ ] the bar for reasonable doubt higher and infringed upon the presumption of innocence," *id.* at 806, this Court quoted our holding in *Porter, supra*, that the distinction between "hesitate" and "restrain before acting" is "*de minimis*" and that "such a subtle variation in phrasing would not be an abuse of the trial court's discretion," 728 A.2d at 899 (deeming claim "hyper-technical" and "semantical"). *See also Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 255 (2006) (quoting *Porter* holding in denying relief on identical claim); *Commonwealth v. Brown*, 470 Pa. 274, 368 A.2d 626, 634 (1976) (denying relief on identical claim); *Commonwealth v. Banks*, 454 Pa. 401, 311 A.2d 576, 581 (1973) (same). Moreover, beginning decades before appellant's trial, we have repeatedly expressed our approval of definitions of reasonable doubt in terms of a doubt that would "restrain a reasonable man (or woman) from acting. . . ." *Commonwealth v. Donough*, 377 Pa. 46, 103 A.2d 694, 697 (1954); *Commonwealth v. Sauders*, 390 Pa. 379, 134 A.2d 890, 895 (1957); *Commonwealth v. Burns*, 409 Pa. 619, 187 A.2d 552, 561 (1963); *Commonwealth v. Butler*, 442 Pa. 30, 272 A.2d 916, 920 (1971); *Commonwealth v.*

*Young,* 456 Pa. 102, 317 A.2d 258, 261–62 (1974); *Commonwealth v. (Thomas) Hawkins,* 567 Pa. 310, 787 A.2d 292, 301–02 (2001). In light of this copious authority in existence at the time of appellant's trial, the notion that prior counsel were ineffective for failing to challenge the court's approved reasonable doubt instruction is frivolous. Therefore, the PCRA court did not err in denying an evidentiary hearing on this claim.

### 4. *Admission of appellant's letters to Kevin Cofer*

▌ Appellant next claims that the PCRA court erred in denying a hearing on his claim that direct appeal counsel was ineffective for failing to argue that the trial court erred in admitting, without properly authenticating, two letters that appellant wrote to Cofer, imploring Cofer not to testify against him. Appellant submits that, after the prosecution introduced the letters at trial, Cofer denied having read or received them and appellant provided a handwriting exemplar that allegedly confirmed that appellant was not the author of the letters.

Citing Pa.R.E. 901, the Commonwealth counterargues that the letters were authenticated "by their distinctive characteristics, taken in conjunction with the circumstances of the case, as having been written by [appellant]." Commonwealth's Brief at 64–65. In particular, the Commonwealth notes that the letters: were mailed from the prison in which appellant was incarcerated; contained appellant's unique seven-digit prison identification number; urged a course of conduct that would benefit appellant and only appellant; and identified appellant's trial counsel by name. Citing our direct appeal opinion in this case, the Commonwealth further argues that, in any event, the letters were admitted not as evidence of appellant's consciousness of guilt but to explain Cofer's recantation of his prior statements implicating appellant. *Id.* at 65–66 (citing *(Rodney) Collins,* 702 A.2d at 544). Thus, the Commonwealth explains, the letters did not need to be authenticated as actually written by appellant but, rather, merely as purporting to have been written by appellant because even the

latter would serve as persuasive evidence to explain Cofer's recantation.

In denying relief on this claim, the PCRA court noted numerous circumstances that together served to authenticate the letters, including, *inter alia:* that appellant's name and address were on the return address of both envelopes; that both letters addressed Cofer as "Kabir/Kev," which Cofer testified were his nicknames; and that the contents of the letters mentioned appellant's trial counsel by name and otherwise connected the letters to appellant.

The admission of evidence is a matter committed to the sound discretion of the trial court, and the decision to admit certain evidence will not be overturned absent an abuse of that discretion. *E.g., Commonwealth v. Edwards,* 588 Pa. 151, 903 A.2d 1139, 1156 (2006), *cert. denied,* 549 U.S. 1344, 127 S.Ct. 2030, 167 L.Ed.2d 772 (2007). Pennsylvania Rule of Evidence 901 provides, in pertinent part, as follows:

**Rule 901. Requirement of authentication or identification**

**(a) General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

**(b) Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

* * * *

(4) *Distinctive characteristics and the like.* Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

* * * *

Pa.R.E. 901. Although Rule 901 had not yet been adopted at the time of appellant's trial, it is consistent with the Pennsyl-

vania jurisprudence on authentication that existed prior to appellant's trial. *See, e.g., Commonwealth v. Brooks,* 352 Pa.Super. 394, 508 A.2d 316, 318–20 (1986) (noting as relevant circumstances such as "information in the contents of the writing that is known by the purported sender and the recipient, events preceding or following the execution or delivery of the writing, other communications by the purported sender prior to or following the execution or delivery of the document, [and] the appearance of the purported sender's name or letterhead on the document"); *see also Commonwealth v. Zook,* 532 Pa. 79, 615 A.2d 1, 10 (1992) (citing *Brooks* for proposition that "[a] document may be authenticated by circumstantial evidence"); *Stotz v. Shields,* 696 A.2d 806, 809 (Pa.Super.1997) (same and noting that such circumstances are "myriad" and include "appearance, contents, and substance").

We agree with the Commonwealth that the trial court's decision to admit the two letters was well within its discretion. The circumstances cited by the PCRA court and the Commonwealth are more than sufficient, when considered in their totality, to authenticate the letters. We further note that the first letter mentioned trial counsel's name in the context of the defense's trial strategy of shifting suspicion for the murder away from appellant and toward Cofer, N.T., 5/10/93, at 374–75; that the second letter referred to the first one, *id.* at 378; and that the letters were dated within several weeks of Cofer's July 14, 1992 police statement, which the first letter referenced, *id.* at 376–77. Because appellant's underlying claim of trial court error lacks arguable merit, his derivative ineffectiveness claim did not warrant an evidentiary hearing.

### 5. Appellant's boilerplate request for new trial counsel

■ In his fifth and final underlying issue based on the PCRA court's denial of an evidentiary hearing, appellant claims that direct appeal counsel was ineffective for failing to argue that the trial court erred in failing to grant a timely hearing on appellant's pre-trial petition for new appointed trial counsel. Appellant argues that the trial court wrongly relied on appellant's statement to the court that he was satisfied with

counsel's representation because he only meant that he was satisfied with trial counsel's advice to waive a motion to suppress.

The Commonwealth offers four independent reasons why the instant claim does not entitle appellant to relief. Specifically, the Commonwealth contends that: (1) the claim is presented on a second page of appellant's Statement of Questions Involved, in violation of Pa.R.A.P. 2116; (2) appellant fails to present any affidavit or other offer of proof specifying what allegations he would have raised at a hearing on his petition for new counsel; (3) a hearing was unwarranted because "any putative error could still be corrected" since the case had not yet proceeded to trial (Commonwealth's Brief at 68); and (4) a pre-trial colloquy conducted by the trial court sufficed to provide appellant an opportunity to raise any concern he had with his representation. This last argument forwarded by the Commonwealth was the PCRA court's basis for denying relief on the instant claim.

 "The decision of whether to appoint new counsel lies within the sound discretion of the trial court." *Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139, 1150 (2000) (citing *Commonwealth v. Segers*, 460 Pa. 149, 331 A.2d 462, 465 (1975)). A hearing on a motion for new counsel is not required where the defendant provides only a general averment of inadequate representation. *See, e.g., Commonwealth v. (Raymond) Williams*, 514 Pa. 62, 522 A.2d 1058, 1061 (1987). On collateral appeal, an appellant "who is alleging ineffectiveness must set forth an offer to prove at an appropriate hearing sufficient facts upon which an appellate court can conclude that trial counsel may have, in fact, been ineffective. This Court will no longer consider claims of ineffective assistance of counsel in the abstract." *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365, 368 (1984) (quoting *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332, 1335 (1981)).

On October 30, 1992, more than six months before trial, appellant filed three standardized forms in the trial court, namely: a Motion for Bill of Particulars; a Motion to Quash

the Issuing Authority's Transcripts, Lack of Credibility; and a Petition for Withdrawal of Counsel and Appointment of New Counsel. The new counsel petition read, in its entirety, as follows:

> TO THE HONORABLE JUDGES OF THE AVOVE [sic] SAID COURT:
>
> I, **RODNEY COLLINS,** Pro-se Petitioner in the foregoing action respectfully represents [sic] the following:
>
> (1) On **7–14–92,** Petitioner was arrested and charged with a series of offenses arising out ot [sic] an alleged **MURDER,** having occurred in the city and county of Philadelphia.
>
> (2) During the **PRE–HEARING** proceedings of this matter, Petitioner was represented by **LOUIS SAVINO,** Esq., at the time of the aforementioned proceedings said counsel was ineffective at **PRE–HEARING,** proceedings.

Petition for Withdrawal of Counsel and Appointment of New Counsel (filed Oct. 30, 1992) (emphasis added to indicate appellant's written responses in blank spaces on form). As set forth in his Brief to this Court, appellant's supposed grounds for an entitlement to new counsel that he would have explored at a hearing are that trial counsel had inadequately prepared for trial and was burdened by a conflict of interest due to his prior representation of Aaron Montague. We have already determined that trial counsel's appearance on behalf of Aaron Montague at a sentencing hearing in an unrelated drug case did not create a conflict of interest that could have compromised counsel's representation of appellant at his trial. With respect to trial counsel's allegedly inadequate preparation for trial, appellant asserts that the trial court should have inquired into whether trial counsel: had investigated the facts of the case; had interviewed witnesses; and had investigated other suspects, including Aaron Montague. Appellant, however, did not include these allegations in his petition for new counsel and apparently never raised them before the trial court at any time.

We find this Court's decision in *(Raymond) Williams, supra,* instructive here. In *Williams,* the capital defendant wrote a letter to the trial court shortly before jury selection requesting withdrawal of his counsel "for the reason that he felt he would 'not get proper representation from [counsel].'" 522 A.2d at 1061. Counsel actually joined in the request, stating that he and the defendant "wouldn't be able to enjoy any kind of cooperation" and noting that the defendant had filed suit against him in federal court. *Id.* The trial court summarily denied the defendant's request on the grounds that he "failed to state 'substantial reasons' why new counsel should be appointed." *Id.* On appeal, this Court affirmed the denial "[i]n view of [the defendant]'s failure to supply any reasons, much less substantial ones, why new counsel should be appointed." *Id.*

Instantly, appellant's new counsel petition included the solitary bald assertion that trial counsel "was ineffective at pre-hearing proceedings." Not only did appellant's petition assert inadequate representation in generic fashion, similar to the petition that was summarily denied in *Williams,* but, even now, appellant fails to specify any way in which trial counsel was ineffective when representing him at any pre-trial proceeding. The broad allegations of trial counsel's inadequate trial preparation that appellant alleges in his Brief to this Court are simply irrelevant to counsel's effectiveness at pre-trial proceedings. In sum, appellant now claims that the trial court should have allowed him to explore a pre-trial ineffectiveness allegation, the basis of which he never specified and, in any event, one that he now abandons in favor of the many allegations raised herein of counsel's inadequate preparation for trial and deficient performance **during** trial. Because there is no genuine issue of material fact with respect to this frivolous underlying claim of trial court error, appellant's derivative ineffectiveness claim did not warrant a hearing in the PCRA court.

## B. PCRA Discovery and Evidentiary Rulings

Appellant next presents four claims based on alleged errors made by the PCRA court in certain discovery and evidentiary

 

matters that arose during the PCRA hearing.[15]

## 1. *Testimony of Dana Cook*

 Appellant first claims that the PCRA court erred in excluding the testimony of Dana Cook, an investigator employed by the defense, in support of appellant's claim that trial counsel Savino was burdened with a conflict of interest. Appellant alleges that Ms. Cook would have testified that inmate James Drayton told her in 2000 that he overheard a 1992 conversation between Attorney Savino and Aaron Montague during which Savino told Montague that "he [Montague] did not need to worry about being a potential suspect [in the Graves murder] because Savino had everything under control." Appellant's Brief at 65. Appellant argues that Cook's testimony would not have constituted double hearsay because neither statement would have been inadmissible. First, appellant contends that Savino's statement to Montague was not hearsay because it was not offered to show that Montague was a potential suspect (or that Savino indeed "had everything under control") but, rather, to show that Savino was aware of Montague's connection to appellant's case. Second, appellant insists that Drayton's statement to Cook would have been admissible as a statement against interest under Pa.R.E. 804(b)(3) because Drayton would have invoked his Fifth Amendment privilege if he had been called to testify at appellant's PCRA hearing and the statement would have subjected him to conspiracy to obstruct justice charges.

The Commonwealth counterargues that this claim is frivolous. The Commonwealth notes that Drayton's statement to Cook was not a statement against interest under Rule 804(b)(3) because, *inter alia*, it did not indicate that he had conspired with anyone to keep the conversation secret; it did not suggest either affirmative interference with a government function on the part of Drayton or "force, violence, physical

**15.** The Commonwealth argues that appellant waived these claims by presenting them on a second page of appellant's Statement of Questions Involved, in violation of Pa.R.A.P. 2116. Because we find that the claims lack merit, we do not address the Commonwealth's alternative waiver argument.

interference or obstacle, breach of official duty, or any other unlawful act," as required by the obstruction of justice statute, 18 Pa.C.S. § 5101; and, in any event, the statute of limitations for obstruction of justice had expired three years before Drayton's alleged statement to Cook, *see* 42 Pa.C.S. § 5552(b).

The PCRA court addressed this claim in a Supplemental Opinion filed on July 29, 2005. In determining that Drayton's statement to Cook did not constitute a statement against interest, the court noted, *inter alia*, that the statement did not subject Drayton to criminal liability and that Cook was not a person of authority or a person whose interests were adverse to Drayton's.

Pennsylvania Rule of Evidence 804(b) provides, in pertinent part, as follows:

**(b) Hearsay Exceptions.** The following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \*

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

\* \* \* \*

Pa.R.E. 804(b). The statute of limitations for obstruction of justice is five years. 42 Pa.C.S. § 5552(b)(1).

The instant claim is indeed frivolous. Laying aside appellant's failure to address the statute of limitations for obstruction of justice and to attempt to do more than baldly assert

Drayton's potential liability for such offense, appellant suggests no "corroborating circumstances clearly indicat[ing] the trustworthiness of [Drayton's alleged] statement." Because Drayton's alleged statement to Cook clearly would have been inadmissible, we need not address the admissibility of Savino's alleged statement to Cook. The PCRA court did not err in excluding Cook's testimony.

### 2. Testimony of Kevin Cofer regarding identity of "Little Man"

Appellant next claims that the PCRA court erred in sustaining the Commonwealth's objections, on hearsay grounds, to questions posed by defense counsel while examining Kevin Cofer at appellant's PCRA hearing designed to elicit testimony that the individual known as "Little Man" was Aaron Montague. Appellant contends that such testimony would have been admissible under Pa.R.E. 803(19) because Cofer's personal knowledge of the identity of "Little Man" was based on Montague's reputation in the community.

The Commonwealth responds that Rule 803(19) is inapplicable because a person's nickname is not among the facts enumerated in the Rule, nor is it a "similar fact of personal or family history." In any event, the Commonwealth contends, Cofer's personal knowledge as to Montague's nickname would have been cumulative of trial counsel's PCRA testimony that he knew Montague to go by the name "Little Man."

In explaining its exclusion of Cofer's testimony as to Montague's nickname, the PCRA court relied upon Pa.R.E. 602 ("Lack of personal knowledge"). The court noted that Cofer testified that he did not know Montague personally and learned that Montague was called "Little Man" only from newspapers and people in the community.

Pennsylvania Rule of Evidence 803 provides, in pertinent part, as follows:

**Rule 803. Hearsay exceptions; availability of declarant immaterial**

The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \*

**(19) Reputation concerning personal or family history.** Reputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or in the community, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history.

\* \* \* \*

Pa.R.E. 803.

 Rule 803(19) refers to "fact[s] of personal or family history" that, due to their historical nature, are often very difficult to ascertain. Moreover, the pool of persons who have personal knowledge of an individual's birth, death, adoption, *etc.*, is typically quite small, and some or all of such persons may no longer be living at the time proof is sought. *See* 5 WIGMORE ON EVIDENCE § 1481. Reputations among family members or in the community as to such facts are considered inherently trustworthy in light of "the 'natural effusions' ... of those who talk over family affairs when no special reason for bias or passion exists." *Id.* at § 1482. It is for these reasons that reputation evidence of facts of personal or family history is allowed. We agree with the Commonwealth that a person's reputed nickname is not a "fact of personal or family history" that is similar to one's birth, adoption, marriage, divorce, death, legitimacy, or relationship. Neither the necessity for, nor the inherent trustworthiness of, reputation evidence inheres in a mere acquaintance's testimony as to a person's reputed nickname. Therefore, the PCRA court did not abuse its discretion in requiring Cofer to have personal knowledge of Montague's nickname in order to testify with respect thereto.

### 3. Appellant's request to inspect property receipt

Appellant next claims that the PCRA court erred in failing to allow the defense to inspect "with expert assistance" the date recorded on a property receipt as to the timing of a chemical test preformed on the passenger seat headrest of the Taurus. Appellant's Brief at 70. Appellant alleges that although Ronald McCoy, the forensic analyst who filled out the receipt, testified that the test was performed on May 5, 1993, the receipt plainly records the test date as "8/5" and therefore confirms that the Commonwealth "had no excuse for waiting to produce the[ ] [test results] until the second day of trial." *Id.* at 69.

In response, the Commonwealth offers four independent reasons why this claim fails: (1) appellant fails to cite any authority to support it; (2) the PCRA court was able to read the date and determine McCoy's credibility without "specialized knowledge beyond that possessed by a layperson," Pa. R.E. 702; (3) appellant fails to address the fact that the receipt plainly recorded the year as 1993, not 1992; and, in any event, (4) the relevant date for discovery purposes was not the date of the test but, rather, the date or dates the test results were provided to the prosecutor and defense counsel.

The PCRA court determined that appellant failed to develop this claim because he did not cite the notes of testimony to support his assertions that defense counsel requested an inspection of the receipt and that the PCRA court denied the request.

At the PCRA hearing, counsel for the Commonwealth asked Mr. McCoy to read aloud entries he had made on the property receipt in his handwriting. When asked to read the date and time when McCoy began performing the test on the headrest, McCoy testified: "It says 5/5/93, 8:15 a.m." N.T., 10/6/04, at 131; *see also id.* at 128 (McCoy testifying that he performed the test in May 1993). After McCoy read aloud other entries on the receipt, the prosecutor returned to the date and time when the test was begun:

Q. Mr. McCoy, can I direct your attention to the date, first date listed where you performed the exam?

A. Yes.

Q. You testified that you did the exam on May 5th, 1993?

A. Yes, I did.

Q. When I read that date, it looks like an eight. You know your handwriting better than I do. Is that an eight or five?

A. It's a five.

*Id.* at 136. The above PCRA testimony of McCoy is consistent with testimony McCoy gave as to the timing of the test on the third day of trial, just six days after he performed the test. *See* N.T., 5/11/93, at 506.

Instantly, appellant fails to note that there was no dispute in the PCRA court that the property receipt recorded the year as "[']93," *see* N.T., 10/7/04 (p.m.), at 11. Although not explained in his Brief to this Court, the purpose of appellant's request for an expert inspection of the receipt was, in the words of appellant's PCRA counsel, "to subject it to infrared and/or ultraviolet testing . . . [t]o see whether the three was at one point a two." *Id.* at 12. The PCRA court rejected the request as untimely, as appellant did not raise a challenge to the year McCoy performed the test until the day after McCoy testified. *Id.* at 6–12. Appellant's failures to develop this claim consistently with the challenge as raised to the PCRA court and to address the court's timeliness determination preclude meaningful appellate review of the court's denial of appellant's request for an expert inspection of the receipt.

In any event, even assuming the timeliness of the request, and even assuming that the test was actually conducted in August 1992 rather than May 1993, the instant claim ignores the PCRA court's determination that the Commonwealth "turned over [McCoy's] report as soon as it became available," PCRA Ct. Op. at 42. In reaching this determination, the trial court cited McCoy's trial testimony that he prepared the report on May 10, 1993, *id.* at 40 (citing N.T., 5/11/93, at 499–507), as well as defense counsel's representation to the court that he was provided with a copy of the report on that same

date, *id.* (citing N.T., 5/10/93, at 345–47). Instantly, appellant does not dispute either that the report was prepared on May 10, 1993 or that it was provided to both parties later that same day. Therefore, because the timing of the chemical test on the headrest is irrelevant to whether the Commonwealth failed to timely disclose the results of the test, the instant claim is unavailing.

*4. Appellant's requests for Commonwealth's complete files*

 Finally, appellant claims that the PCRA court erred in failing to grant his sweeping requests for production of the complete files of the police investigation into Graves' murder as well as all non-privileged information in the Commonwealth's files. Appellant contends that such an order was warranted given alleged "unexplained gaps" in the discovery provided by the Commonwealth as set forth in the context of appellant's discovery claims. Appellant's Brief at 70.

The Commonwealth responds that appellant is not entitled to relief on this claim both because he fails to cite any authority to support it and because his discovery request was overbroad. As support for its contention that the discovery request was overbroad, the Commonwealth notes that the request was made without regard to whether any particular item had exculpatory value, could be relevant to a PCRA claim, or was already in the possession of the defense. In any event, the Commonwealth argues, the discovery request was premised entirely on allegations of discovery violations on the part of the Commonwealth that were utterly meritless.

In denying relief on this claim, the PCRA court noted that appellant's discovery request was premised on the mere speculation that possible trial court errors or potential exculpatory evidence could be discovered. Accordingly, the court determined that appellant failed to satisfy the "good cause" requirement of Pa.R.Crim.P. 902(E)(2).

 This Court reviews a PCRA court's denial of a discovery request for an abuse of discretion. *Commonwealth v. Bryant,* 579 Pa. 119, 855 A.2d 726, 749–50 (2004). "On the first counseled petition in a death penalty case, no discovery

shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." Pa. R.Crim.P. 902(E)(2). "A showing of good cause requires more than just a generic demand for potentially exculpatory evidence." *Bryant*, 855 A.2d at 750 (quoting *Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d 872, 889 (2002)).

Appellant's PCRA discovery request was the same sort of generic plea for hypothetical evidence that we have rejected as falling far short of the "good cause" requirement of Rule 902(E)(2). *See, e.g., Bryant*, 855 A.2d at 750 (rejecting discovery request of petitioner who "merely speculate[d] as to possible trial court errors, or potentially exculpatory evidence"); *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 261 (2006) (rejecting "fishing expedition for possible exculpatory evidence"). The PCRA court acted well within its discretion in refusing to order such all-encompassing discovery upon mere generic demand.

### III. CONCLUSION

For the foregoing reasons, we affirm that part of the order of the PCRA court denying appellant a new trial.

Justice SAYLOR, EAKIN and BAER, Justice TODD, Justice McCAFFERY and Justice GREENSPAN join the opinion.