J-S28006-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VICTOR TIRADO | : | |
| | : | |
| Appellant | : | No. 2011 MDA 2019 |

Appeal from the PCRA Order Entered December 4, 2019
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0001914-2017

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 11, 2020**

Victor Tirado appeals from the order that dismissed without a hearing his petition filed pursuant to the Post Conviction Relief Act ("PCRA").  We affirm.

The PCRA court offered the following summary of the facts regarding Appellant's underlying convictions.

> Officer David Rachor ("Rachor") of the Lancaster City Bureau of Police ("LCBP") testified at trial that on September 9, 2015, at approximately 11:45 p.m., he received a dispatch for a report that a person had shot [himself].  Upon responding to the area of 215 East Fulton Street in Lancaster City, two females directed Rachor to Randir Maxton ("victim"), who was lying on the ground with his right hand curled back underneath his head.  The victim was still alive but there was a large pool of blood around his head and he was non-responsive.  While the victim was being loaded into an ambulance, Rachor saw a gun in his right hand. However, the victim's gun and right hand were still partially in the pocket of a hoodie the victim was wearing.  Rachor also observed a bullet casing and two cellphones on the ground near the feet of the victim.

Officer Austin Krause ("Off. Krause"), LCBP, testified that when he responded to the scene he saw a wound on the side of the victim's head just under the left earlobe. Officer Krause rode with the victim in the ambulance to the hospital and collected the victim's clothing, an iPhone, and a corner tie baggie of suspected crack cocaine. At that time, Off. Krause noticed a bullet hole in the hood on the left side of the hoodie. Officer Ryan Burgett ("Burgett"), LCBP, responded to the scene and identified two females standing in the parking lot as Jasmin Raqib ("Raqib") and Lashell Carter. Burgett collected two cellphones laying on the ground near the victim. Detective Jeffrey Krause ("Det. Krause") of the Lancaster County District Attorney's Office processed the crime scene. Det. Krause collected the shell casing, a handgun, and a sample of blood from the scene. The firearm was a Bersa 380, which fires a .380 caliber round of ammunition. The shell casing was a .45 caliber shell casing, which in Det. Krause's experience could not be discharged through a .380 handgun. Moreover, because a shell casing was recovered at the scene, a semiautomatic firearm had to be used to eject the casing after the round was discharged.

Raqib testified that she was returning to her apartment at approximately 11:45 p.m. with her daughters and a friend when she saw a man wearing a black hoodie walk from the side of the apartment building where she lives towards the alleyway with his hands in his pocket. As he went into the alleyway, Raqib heard a pop. Thereafter, Raqib's daughter saw that same man in the black hoodie laying on the ground with a gunshot wound to his head. Raqib never heard any voices and she did not see any other persons. As she approached the victim to render aid, Raqib saw he had a gun. Kevin Beerman ("Beerman") was home at approximately 11:45 p.m. when he heard a gunshot. Beerman looked out the window and saw a person "kind of quickly running, almost between a run and a jog. . . ." away from the shot. The person appeared to be a male, but Beerman was not able to see his face, could not determine the race of the individual, and could not accurately determine the height. The person was wearing a dark hoodie and dark pants. Beerman did not see anyone else on the street, and prior to the gunshot he did not hear anything unusual. Randell Zook ("Zook"), LCBP, testified that the police located relevant video surveillance footage from a private residence, the Lancaster Cleft Palate Clinic, and a Lancaster Community Safety Coalition camera. Zook compiled footage from the three videos into a single clip. Video from the residence

showed a subject walk through a parking lot, round a corner, and go out of view. Another subject is then seen coming from behind a building, the two meet up behind a fence, and a flash is visible. The Cleft Palate video showed two people meeting. The Safety Coalition video showed a subject walking across a nearby street after coming out of an alley.

Kristin McNeil ("McNeil") testified that she and the victim lived at 215 East Fulton Street in Lancaster City. Earlier in the day on September 9, 2015, when McNeil returned home from work, the victim was reluctant to open the door and let her inside. The victim was acting "nervous and hesitant." McNeil acknowledged the victim sold drugs. The victim told McNeil there had been a shooting a couple days earlier, he was being mentioned as the shooter, and other people were making threats against him. They decided to stay in the house that evening.

McNeil stated the victim received a phone call later that evening from a person with a Hispanic accent who was speaking English. When the conversation ended, the victim threw on a hoodie and stated he was going outside to meet "Vic." McNeil knew who "Vic" was because she had met him a few weeks before the shooting in the parking lot outside her house, when he approached her and the victim. At trial, McNeil identified Appellant as the person she knew to be "Vic." On the night of the shooting, McNeil went to sleep after the victim left the residence and was awakened by the victim's brother, at which time she looked out the window and saw [the] police.

David Ramos-Perez ("Ramos") testified that he knew Appellant through prior dealings, and he was with Appellant and Harry Espada ("Espada") on the night of September 9, 2015. At some point that evening, Ramos, Espada, and Appellant left a residence so Appellant could meet with "Spank" to get some drugs. Ramos was not present when Appellant set up the deal, but Appellant stated he ordered a "20 piece" of crack. Espada drove, Ramos was in the front passenger seat, and Appellant was in the back seat. As they were driving, Appellant called to let "Spank" know he was on the way. When they arrived in Lancaster City, they parked under a tree near a gas station. Only Appellant got out of the car, and stated he would be right back. Appellant was wearing a black hoodie, black sweatpants, and black shoes.

As he and Espada were sitting in the car, Ramos heard "a big firework, like boom" and looked around to see if there was a car crash. A few minutes later, Appellant came running back to the car and stated "we gotta go, let's get out of here." When he got in the car, Appellant stated "it only took one shot." As they were trying to figure out what he was saying, Appellant kept telling them to get out of there. Ramos never saw Appellant with a gun that day and never spoke directly to Appellant about what happened that night.

Espada testified that he knew Appellant for a couple years and was with him on the night of this incident. Around midnight, Appellant's step-son asked Espada to take Appellant to get some drugs from "Spanky." Espada, Ramos, and Appellant then left the residence, with Espada driving the car. Espada had taken Appellant to buy drugs from Spanky before and he parked away from the location because Spanky did not like anyone parking near his house. Appellant got out of the car while Espada and Ramos remained inside.

Appellant was wearing a black hoodie and black sweatpants. Espada stated that Appellant was fine and did not say anything unusual when he returned to the car. They then drove off and returned to Espada's residence. According to Espada, at no time did Appellant say anything about what happened between he and Spanky. Espada acknowledged he did not speak to police about this incident until he was charged with hindering apprehension for being the getaway driver in this case.

Detective Stephen Owens ("Owens"), LCBP, obtained records for telephone numbers belonging to the victim and Appellant on the date of the incident. After analysis, Owens determined that Appellant and the victim had called each other 799 times between August 21, 2015 and the night of the murder. On the night of the murder, Appellant called the victim at 10:48 p.m., the victim called Appellant at 10:53 p.m., Appellant called the victim once again at 11:35 p.m., this was the last call ever received by the victim, and Appellant's phone had no activity between 11:35 p.m. and 11:46 p.m. Police received a dispatch for the shooting at 11:45 p.m.

Detective Stanley Roache ("Roache"), LCBP, testified that police did not attempt to interview Ramos or Espada after the shooting because they had no idea who was involved. In fact,

Roache did not realize those individuals had any information about the case until they came forward after they were arrested on unrelated charges. During a later interview, Espada told Roache that when Appellant returned to the car he stated "I just killed that n-----. Let's get out of here. . . ." Espada also told Roache that Appellant stated the victim had a gun, which was information the police had never made public.

In his testimony, Ramos stated that Appellant walked with a limp. Roache confirmed that he had seen Appellant walk on several occasions and Appellant had a very distinctive walk that he would almost call a limp. Moreover, Roache indicated Appellant's walk was similar to the person observed walking in the Safety Coalition video recovered from near the crime scene. To illustrate, Roache then juxtaposed footage of the person seen walking in the Safety Coalition video with video footage showing Appellant casually walking around while incarcerated awaiting trial.

On February 1, 2018, following a two-day jury trial, Appellant was found guilty of first[-]degree murder. On February 7, 2018, Appellant was sentenced to a mandatory term of life imprisonment without the possibility of parole.

PCRA Court Opinion, 12/31/19, at 1-7 (citations and footnotes omitted).

Appellant's direct appeal resulted in no relief. *See Commonwealth v. Tirado*, 201 A.3d 849 (Pa.Super. 2018) (unpublished memorandum). Appellant filed a timely PCRA petition on July 10, 2019. Counsel was appointed and filed an amended petition raising claims of ineffective assistance of counsel. Following an answer from the Commonwealth alleging a lack of merit, the PCRA court on November 7, 2019, issued notice of its intent to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907. The court dismissed the petition by order of December 4, 2019.

Appellant filed a timely notice of appeal, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925. Appellant presents one question for this Court's consideration:

Two witnesses testified that they were with [Appellant] before the murder, drove him to the scene, and drove him away afterward. One of them was even charged with hindering [Appellant's] apprehension. His counsel did not request a corrupt-source instruction for those witnesses. Did the PCRA court err when it dismissed the claim without a hearing?

Appellant's brief at 4.

We begin with a review of the pertinent legal principles. "This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error." *Commonwealth v. Rizvi*, 166 A.3d 344, 347 (Pa.Super. 2017). "[A] PCRA court has discretion to dismiss a PCRA petition without a hearing if the court is satisfied that there are no genuine issues concerning any material fact; that the defendant is not entitled to post-conviction collateral relief; and that no legitimate purpose would be served by further proceedings." *Commonwealth v. Cruz*, 223 A.3d 274, 277 (Pa.Super. 2019) (internal quotation marks omitted). Further, "[i]t is an appellant's burden to persuade us that the PCRA court erred and that relief is due." *Commonwealth v. Stansbury*, 219 A.3d 157, 161 (Pa.Super. 2019) (internal quotation marks omitted).

Counsel is presumed to be effective, and a PCRA petitioner bears the burden of proving otherwise. *Commonwealth v. Becker*, 192 A.3d 106, 112

(Pa.Super. 2018). To do so, the petitioner must plead and prove: "(1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error." *Commonwealth v. Selenski*, 228 A.3d 8, 15 (Pa.Super. 2020) (internal quotation marks omitted). "A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Id*. at 16 (cleaned up). The failure to establish any prong is fatal to the claim. *Id*. at 15.

Appellant's claim is that counsel was ineffective in failing to request a corrupt or polluted source instruction as to Commonwealth witnesses. "A corrupt source instruction advises the jury that if it finds that a certain witness who testified against the defendant was an accomplice of the defendant in a crime for which he is being tried, then the jury should deem that witness a 'corrupt and polluted source' whose testimony should be considered with caution." *Commonwealth v. Collins*, 957 A.2d 237, 262 (Pa. 2008). Such an instruction "is warranted where the evidence is sufficient to present a jury question with respect to whether the Commonwealth's witness is an accomplice." *Commonwealth v. Hanible*, 30 A.3d 426, 462 (Pa. 2011).

Our High Court has explained that "accomplice liability requires evidence that the person: (1) intended to aid or promote the substantive offense; and

- 7 -

(2) actively participated in that offense by soliciting, aiding, or agreeing to aid the principal." **Collins**, **supra** at 263. "One merely present at the crime scene is not an accomplice, nor is one who merely helps an offender try to escape arrest or punishment an accomplice." **Id**. (citations omitted).

The PCRA court offered an account of why it found no arguable merit to Appellant's claim, detailing its view of why the application of the relevant case law to the evidence at trial did not support an inference that Ramos-Perez and Nunez were accomplices. **See** PCRA Court Opinion, 12/31/19, at 10-14. It further opined that Appellant suffered no prejudice, explaining as follows:

> There is also no reasonable probability the outcome of the trial would have been different if counsel had requested the corrupt-source charge. McNeil testified at trial that immediately prior to the shooting the victim received a telephone call from Vic. The victim then stated he was going outside to meet with Vic. McNeil knew who Vic was because she met him in the parking lot outside her house a few weeks before the shooting, when she was with the victim. McNeil identified Appellant in the courtroom as the person she knew to be Vic.
>
> To corroborate McNeil, Detective Owens determined through phone records that Appellant called the victim at 10:48 p.m. on the night of the shooting and the victim called Appellant at 10:53 p.m. Appellant called the victim once again at 11:35 p.m, and this was the last call the victim received. Police received a dispatch for the shooting ten minutes later, and Appellant's phone had no activity during that ten-minute period of time.
>
> Furthermore, Detective Roache noted that Appellant had a very distinct walk, similar to the person observed walking in the Safety Coalition video recovered from near the crime scene. Roache then juxtaposed footage of the person seen walking in the Safety Coalition video with video footage from prison showing Appellant casually walking around.

**Id**. at 15.

Appellant asserts that the PCRA court's contention that the evidence does not support an inference that Ramos-Perez and Nunez were accomplices in the murder of the victim "is dubious." Appellant's brief at 13. He offers an analysis of the arguable-merit prong of his claim by elucidating why he believes that the evidence, and the Commonwealth's theory of the case, required a corrupt-source instruction. *Id*. at 10, 12-14. Appellant also maintains that there is a dispute of fact as to counsel's decision not to request the instruction, and that he was entitled to a hearing to make a record regarding the reasonable basis prong. *Id*. at 10-11.

However, there is a dearth of argument from Appellant concerning the PCRA court's prejudice analysis. His only offerings as to the prejudice prong are that he "was prejudiced because no other witnesses could affirmatively place him at the scene" of the murder, and that there was a genuine issue of fact regarding prejudice because "a corrupt-source instruction would have been proper." Appellant's brief at 8, 11.

Appellant has failed to establish that the PCRA court erred in determining that the prejudice prong of his claim fails. First, the PCRA court's detailed recitation of the evidence reproduced above belies Appellant's contention that the testimony of his alleged accomplices provided the only evidence that Appellant was at the murder scene. To the contrary, the testimony of the victim's paramour, corroborated by telephone records, independently established that the victim went to meet Appellant after

Appellant called him. Moreover, video evidence placed Appellant with his distinct gait at the scene. *See* PCRA Court Opinion, 12/31/19, at 15. Second, Appellant's argument that the instruction would have been properly given goes to the arguable merit of the claim, not the issue of whether confidence in the outcome of the proceedings is undermined by counsel's failure to ensure the instruction was given. Finally, Appellant cites no disputed facts concerning the prejudice prong.

Accordingly, Appellant has failed to meet his burden of convincing this Court that the PCRA court erred in rejecting his claim of ineffective assistance of counsel and dismissing his petition without a hearing. ***See Commonwealth v. Wholaver***, 177 A.3d 136, 166 (Pa. 2018) (affirming PCRA court's rejection without a hearing of a claim that counsel was ineffective in not seeking a corrupt-source charge where, assuming *arguendo* that it had arguable merit, the appellant's bald claim of prejudice failed to establish that the outcome of the proceedings would have been different). No relief is due.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/11/2020

- 10 -