J-S05042-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
FREDERICK PRYOR :
Appellant :
: No. 608 WDA 2023

Appeal from the PCRA Order Entered April 25, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0013565-2016

BEFORE: PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: FEBRUARY 29, 2024**

Appellant, Frederick Pryor, appeals from the post-conviction court's April 25, 2023 order dismissing his timely-filed petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. Appellant raises one claim of trial counsel's ineffectiveness. After careful review, we affirm.

The PCRA court set forth the facts of Appellant's case, as follows:

On September 23, 2016, … [Appellant] entered Chuong's Market on Arlington Avenue in the Arlington section of the City of Pittsburgh. He was wearing a Chicago White Sox hat and his face was concealed with some type of a scarf or other clothing. After walking briefly around the store, … [Appellant] approached PanSun Chuong, who was working the cash register at a small desk in the store. … [Appellant] pointed a small handgun at Ms. Chuong and demanded that she give him all of the money in the cash register. He placed a blue backpack on the counter and ordered her to place the money inside the backpack. While Ms. Chuong was removing money from the cash register, a customer of the store, Madeline Cole, entered the store. Ms. Cole was preoccupied with winning lottery tickets. She walked right past … [Appellant] and approached the cash register. When Ms. Cole realized that a robbery was in progress, … [Appellant] ordered Ms. Cole and Ms. Chuong to lie down in the back of the store while

pointing the gun at them. He took the backpack full of money and exited the store. He left the scene in a vehicle described as a white GMC Yukon SUV. The robbery was captured on video surveillance and was played at trial. Ms. Chuong was unable to identify … [Appellant] because he had his face covered.

On October 13, 2016, … [Appellant] entered the Be Nice African Braiding establishment in the Sheraden section of the City of Pittsburgh. At the time he entered this establishment, … [Appellant's] face was covered with some sort of cloth and he was wearing a Chicago White Sox hat. … [Appellant] again was wielding a handgun. Ousamne Diallo, one of the owners of the establishment, was in the store with a customer, braiding the customer's hair. Ms. Diallo's young child was with her in the store. … [Appellant] pointed the gun at Ms. Diallo and demanded that she give him money. He wanted money from the cash register, her person and her purse. … [Appellant] put his hands into Ms. Diallo's pockets. Ms. Diallo complied with his demands, put the money into a box and gave the money to … [Appellant]. During the robbery, Ms. Diallo's husband called her. … [Appellant] threatened Ms. Diallo to prevent her from answering the phone. … [Appellant] then exited the store. She was unable to identify … [Appellant] because his face was covered. Ms. Diallo did observe that … [Appellant's] hair appeared to be in dreadlocks. Video surveillance of the robbery was played at trial.

Later that same day, … [Appellant] entered Ann's Market in the Hill District section of the City of Pittsburgh. Wearing the same Chicago White Sox hat and a cloth covering his face, … [Appellant] pointed a handgun at Tameika Shackleford. Ms. Shackleford was working the cash register. … [Appellant] demanded money and he also took three packs of Newport cigarettes from the business. Ms. Shackleford gave … [Appellant] money from the cash register and also from her person. Ms. Shackleford observed that … [Appellant's] hair was braided or in dreadlocks. After … [Appellant] left the business, Ms. Shackleford went to the side door of the business and observed … [Appellant] enter a white GMC SUV. She obtained the license plate information and called 911. Surveillance video of the robbery at Ann's Market was played at trial.

On the same day, … [Appellant] returned to Chuong's Market. He walked directly to the area where Ms. Chuong was sitting and pointed the gun at Ms. Chuong. He again demanded the money. Ms. Chuong recognized the Chicago White Sox hat and the gun

and literally asked … [Appellant], "you come back?" … [Appellant] nodded "yes." Ms. Chuong pressed an alarm, gave … [Appellant] some money and … [Appellant] left the store. Again, Ms. Chuong was unable to identify … [Appellant] because he had his face covered.

At the time of the robberies, detectives had been conducting an investigation into a rash of robberies in the City of Pittsburgh. On October 13, 2016, officers had developed a suspect vehicle because of the report that a white GMC SUV with a license plate of JZG-3310 had been observed driving away from the scene of the Ann's Market robbery. The vehicle and its license plate had also been captured on a street surveillance camera. Officers learned that the registered owner of the vehicle was … [Appellant's] girlfriend. Officers had also developed an address to which the suspect vehicle was registered, 104 Minooka Street. There had been a previous hit-and-run incident involving that vehicle and … [Appellant] had been driving the vehicle during the hit-and-run. Immediately after the report of the robbery at Ann's Market, officers travelled to 104 Minooka Street to conduct surveillance on that residence. While parked near 104 Minooka Street, officers learned over the radio of the second robbery at Chuong's Market. Shortly after learning of the Chuong's Market robbery, officers observed the white GMC SUV pull up in front of 104 Minooka Street and park. Officer Justin Simoni was one of the officers conducting surveillance in that area in an unmarked police vehicle. The emergency lights of the unmarked vehicle were activated and Officer Simoni's vehicle pulled up behind the white GMC SUV. As Officer Simoni approached the vehicle, the front driver's side door of the white GMC SUV opened. … [Appellant] exited the vehicle and Officer Simoni immediately ordered … [Appellant] to the ground. … [Appellant] did not comply with the order and Officer Simoni physically grabbed … [Appellant], placed him on the ground and handcuffed him. … [Appellant] was quickly brought to his feet and patted down. He was then transported to Pittsburgh Police Headquarters and the white GMC SUV was towed from the scene. It was not searched at the scene.

Officers also compared surveillance video to photographs of … [Appellant]. … [Appellant] shared the same physical characteristics of the person observed in the security video of the robberies.

> While at the police station, officers read … [Appellant] his **Miranda**[1] rights. … [Appellant] initially denied any involvement in the robberies. Officers then left the interview room to apply for a search warrant for the white GMC SUV. Upon their return to the interview room, … [Appellant] agreed to speak to the officers. His **Miranda** rights were read to him again. Officers informed him that they applied for a search warrant. … [Appellant] did not request an attorney and he did not ask for the interview to stop. … [Appellant] then admitted to committing all four robberies described above.

> The white GMC SUV was searched pursuant to a search warrant. A black Chicago White Sox hat, a handgun, a blue backpack, latex gloves and $200 in small bills were found in the vehicle. The parties stipulated that … [Appellant] had a prior conviction for robbery of a motor vehicle. … [Appellant] also had a prior conviction for robbery of a motor vehicle and he did not have a license to possess or carry a firearm.

> Additionally, germane to the instant issue, testimony was presented during trial that fingerprints were recovered from the driver's side and the passenger side of the GMC SUV. A fingerprint examiner specifically testified that the fingerprint recovered from the driver's side was not usable for comparison purposes. The fingerprint recovered from the passenger side was not a fingerprint of [Appellant].

PCRA Court Opinion (PCO), 6/26/23, at 2-5 (footnote omitted and some formatting altered).

Appellant was arrested and proceeded to a jury trial in April of 2019, at the close of which he was convicted of four counts of robbery, three counts of recklessly endangering another person, one count of carrying a firearm without a license, and two counts of possession of a firearm by a person prohibited. On July 30, 2019, the court sentenced Appellant to an aggregate term of 30 to 60 years' incarceration, followed by five years' probation. He

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

- 4 -

filed a timely direct appeal, and this Court affirmed on April 21, 2021. *See*

*Commonwealth v. Pryor*, 253 A.3d 299 (Pa. Super. 2021) (unpublished

memorandum). Appellant did not file a petition for allowance of appeal with

our Supreme Court.

Instead, Appellant filed a timely, *pro se* PCRA petition on May 4, 2022.

Counsel was appointed and filed an amended petition on February 1, 2023.

Therein, Appellant claimed that his trial counsel was ineffective for not

objecting and requesting a mistrial when testimony offered by Commonwealth

witnesses revealed that the Commonwealth had violated *Brady v. Maryland*,

373 U.S. 83 (1963), by failing to disclose, during pretrial discovery, forensic

results and a forensic report. Specifically, Appellant averred:

> Prior to trial, [Appellant] filed a comprehensive motion for
> [d]iscovery. The discovery provided by the Commonwealth did
> not contain any forensic reports. During the Jury Trial, Detective
> Paul Becker (Becker) of the Mobile Crime Unit testified that he
> processed the vehicle [Appellant] was driving for DNA and
> fingerprints. As a result, two fingerprints were recovered from
> inside the vehicle. While testifying, Becker could not recall where
> the prints were lifted in the vehicle. However, he refreshed his
> recollection by reviewing his report. That report revealed that one
> print came from the passenger side, and the other from the
> driver's side. Moreover, two DNA swabs were done: one on the
> drivers [*sic*] side of the steering wheel, and the other on the gear
> shift. Becker did not know to whom the prints belonged, nor did
> he know the results of the DNA swabs.
>
> Detective John Adams of the Mobile Crime Unit also testified. In
> that capacity, he reviewed the two fingerprints recovered from the
> GMC. One of the two prints was not usable for comparison
> purposes. The other print, which had been lifted from the
> passenger side, did not match [Appellant].
>
> When these witnesses testified, [Appellant] discussed with [his
> trial counsel] the fact that they hadn't received any DNA or

- 5 -

fingerprint reports in response to their discovery request. [Appellant] urged [counsel] to object and to request a mistrial because he felt the Commonwealth purposely withheld this information and committed a ***Brady*** violation. [Appellant] now argues that [his counsel] was ineffective for failing to object during trial to preserve the claim, and then to raise the issue on direct appeal.

Amended PCRA Petition, 2/1/23, at 11-12.

On April 4, 2023, the PCRA court filed a Pa.R.Crim.P. 907 notice of its intent to dismiss Appellant's petition without a hearing. On April 24, 2023, the court issued an order dismissing his petition. However, that same day, the court issued an order vacating its order dismissing Appellant's petition, presumably because Appellant had filed a response to the Rule 907 notice that same day. On April 25, 2023, the court issued another order dismissing Appellant's petition.

On May 19, 2023, Appellant filed a notice of appeal, stating that he is appealing from the PCRA court's "[o]rder entered April 24, 2023, which denied the PCRA petition." Notice of Appeal, 5/19/23, at 1 (unnumbered). Although Appellant's notice of appeal purports to appeal from an order that was vacated, our review of the record reveals that Appellant intended to appeal from the court's April 25, 2023 order denying his PCRA petition. A defective notice of appeal, listing an incorrect order date, does not prevent us from reviewing this appeal. ***See Commonwealth v. One 1988 Ford Coupe VIN No. 1FABP41A9JF143651***, 574 A.2d 631, 633 n.1 (Pa. Super. 1990) (finding that an error in a notice of appeal stating an incorrect date on which the order was entered was harmless). Apart from listing an incorrect date,

Appellant's notice of appeal was timely because he filed it within 30 days of the date the April 25, 2023 order was entered. *See* Pa.R.A.P. 903(a) (directing that a notice of appeal shall be filed within 30 days after entry of order from which appeal taken). Accordingly, this Court amended our docket to reflect that his appeal is properly from the April 25, 2023 order.

The PCRA court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and he timely complied. The court filed its Rule 1925(a) opinion on June 26, 2023. Herein, Appellant raises one issue for our review:

> I. The PCRA [c]ourt erred in denying relief because [Appellant] was denied his Sixth Amendment right to effective counsel at trial and on appeal where prior counsel failed to object and to request a mistrial for a *Brady* violation when it was revealed during the [j]ury [t]rial that forensic results and a forensic report were not provided to the defense prior to trial.

Appellant's Brief at 4.

"This Court's standard of review from the grant or denial of post-conviction relief is limited to examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Morales*, 701 A.2d 516, 520 (Pa. 1997) (citing *Commonwealth v. Travaglia*, 661 A.2d 352, 356 n.4 (Pa. 1995)). Where, as here, a petitioner claims that he or she received ineffective assistance of counsel, our Supreme Court has directed that the following standards apply:

[A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). "Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." [*Commonwealth v.*] *Colavita*, … 993 A.2d [874,] 886 [(Pa. 2010)] (citing *Strickland* [*v. Washington*, 466 U.S. 668 … (1984)]). In Pennsylvania, we have refined the *Strickland* performance and prejudice test into a three-part inquiry. *See* [*Commonwealth v.*] *Pierce*, [527 A.2d 973 (Pa. 1987)]. Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. *Commonwealth v. Ali*, … 10 A.3d 282, 291 (Pa. 2010). "If a petitioner fails to prove any of these prongs, his claim fails." *Commonwealth v. Simpson*, … 66 A.3d 253, 260 ( [Pa.] 2013) (citation omitted). Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. *See Ali, supra*. Where matters of strategy and tactics are concerned, "a finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Colavita*, … 993 A.2d at 887 (quotation and quotation marks omitted). To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Commonwealth v. King*, … 57 A.3d 607, 613 ([Pa.] 2012) (quotation, quotation marks, and citation omitted). "'[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.'" *Ali*, … 10 A.3d at 291 (quoting *Commonwealth v. Collins*, … 957 A.2d 237, 244 ([Pa.] 2008) (citing *Strickland*, 466 U.S. at 694….)).

*Commonwealth v. Spotz*, 84 A.3d 294, 311-12 (Pa. 2014).

Here, Appellant contends that his trial counsel was ineffective for not objecting, and requesting a mistrial, when it became apparent that the Commonwealth committed a purported *Brady* violation by not turning over, during pretrial discovery, forensic reports relating to fingerprint and DNA testing that was conducted in this case.

> Under *Brady* and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. To establish a *Brady* violation, an appellant must prove three elements:
>
> > (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued.
>
> The burden rests with the appellant to prove, by reference to the record, that evidence was withheld or suppressed by the prosecution. The evidence at issue must have been material evidence that deprived the defendant of a fair trial. Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
>
> *Brady* does not require the disclosure of information that is not exculpatory but might merely form the groundwork for possible arguments or defenses, nor does *Brady* require the prosecution to disclose every fruitless lead considered during a criminal investigation.

*Commonwealth v. Roney*, 79 A.3d 595, 607–08 (Pa. 2013) (cleaned up).

Instantly, Appellant contends that he has satisfied the three prongs of establishing a *Brady* violation. First, he insists that the Commonwealth withheld the forensic reports concerning the fingerprint and DNA testing, and

- 9 -

that he "did not know of the results until the middle of his [j]ury [t]rial." Appellant's Brief at 18. Second, Appellant argues that the reports were "favorable evidence" because they showed that "the usable fingerprint did not match [Appellant]," and "the evidence of someone else's prints inside the vehicle tend to establish [Appellant's] innocence by demonstrating that other people had access to the vehicle." *Id.* Third, Appellant claims he was prejudiced by counsel's failure to pursue this "successful *Brady* claim," *id.*, because, "had counsel objected and requested a mistrial, the trial court would have granted the motion. If the court would have denied the motion, the issue would have been preserved for direct appeal where [Appellant] believes the Superior Court would have vacated the judgment and convicted and remanded for a new trial." *Id.* at 19-20. Appellant also contends that, had the Commonwealth turned over the at-issue forensic fingerprint report prior to trial, "then [Appellant's] trial strategy would have incorporated its existence" and "[t]he defense would have capitalized on a forensic report which established that prints found on the vehicle did not belong to [Appellant]." *Id.* at 21. Thus, Appellant stresses that his "entire case was prejudiced because he did not have this report[,]" and had this *Brady* violation not occurred, "it certainly would have produced a different outcome." *Id.* Consequently, he concludes that his "prior counsel rendered ineffective assistance for failing to object and to preserve this issue for appeal." *Id.*

We disagree. Initially, as both the PCRA court and Commonwealth emphasize, the jury heard that Appellant's fingerprints did not match the

usable fingerprint recovered from the vehicle. **See** PCO at 7 ("The fingerprint examiner did, in fact, explain to the jury that the fingerprints could not be attributed to [Appellant]."); Commonwealth's Brief at 12-15 (detailing the testimony that revealed that Appellant's fingerprints did not match the usable print found). Specifically, Detective Becker testified that two fingerprints were recovered from the vehicle, one from the passenger side and one from the driver side. **See** N.T. Trial, 4/22/19-4/25/19, at 140, 141. Detective Adams, a fingerprint examiner, testified that the driver side fingerprint was "not usable for comparison purposes." **Id.** at 148, 149. The lift that came "from the passenger door handle of the vehicle" was "usable[,]" meaning "[i]t did contain sufficient information to be used for comparison purposes." **Id.** at 148, 149. However, Detective Adams testified that he when compared "the fingerprint to known fingerprints of [Appellant,]" the detective found "[t]hey were not his." **Id.** at 149.

Given that the jury heard that no fingerprints found in the vehicle were able to be matched Appellant's fingerprints, he has failed to demonstrate the prejudice prong of the test for establishing a **Brady** violation. Although Appellant insists that, had he received the forensic report prior to trial, he "would have capitalized" on it, and "incorporated its existence" into his "trial strategy[,]" he offers no elaboration on these generic and undeveloped claims. Appellant's Brief at 21.

Moreover, as the PCRA court and the Commonwealth stress, Appellant confessed to committing the crimes. **See** PCO at 7; Commonwealth's Brief at

15. In addition, "his physical appearance is consistent with that of the perpetrator; the car [A]ppellant was driving matched the license plate number provided by one of the victims; [A]ppellant was apprehended in that car shortly after one of the robberies had occurred; and items consistent with those used in the robberies were found in [A]ppellant's car." Commonwealth's Brief at 15-16 (citations to the record omitted). We agree with the Commonwealth that, "[b]ased on this evidence, it is not reasonably probable that the outcome of [A]ppellant's trial would have been different had the results of the fingerprint reports been disclosed prior to trial. Appellant cannot establish that he suffered prejudice under **Brady**...." **Id.** at 16. Accordingly, because Appellant has not proven that prejudice ensued from the Commonwealth's alleged **Brady** violation, his claim that his trial counsel acted ineffectively for failing to raise this **Brady** violation lacks arguable merit.

Finally, we mention that, although Appellant claimed in his PCRA petition that the Commonwealth also violated **Brady** for failing to disclose DNA test results prior to trial, he does not meaningfully develop any argument regarding this evidence, other than to point out that Detective Becker testified that "two DNA swabs were done" and the detective did not know the results of those swabs. Appellant's Brief at 16 (citing N.T. Trial at 142, 143). Thus, we agree with the Commonwealth that Appellant "failed to show that the Commonwealth possessed favorable evidence regarding DNA[,]" as he "does not attempt to establish that DNA results exist" and he failed to "request discovery" before the PCRA court "to find out if such results exist."

Commonwealth's Brief at 16, 17. Accordingly, no relief is due on this claim, either.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/29/2024